136 F.3d 660
 46 ERC 1271, 28 Envtl. L. Rep. 20,632,
98 Cal. Daily Op. Serv. 1121
 NORTHCOAST ENVIRONMENTAL CENTER; Klamath Forest Alliance;
Siskiyou Regional Education Project; Kalmiopsis Audubon
Society; Friends of Elk River; Oregon Natural Resources
Council; and Siskiyou Audubon Society, Plaintiffs-Appellants,
v.
Daniel GLICKMAN, Secretary of the Department of Agriculture;
and Bruce Babbitt, Secretary of the Department of
Interior, Defendants-Appellees.
 No. 96-17074.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 6, 1997.
Decided Feb. 17, 1998.
 
 Michael Axline, Carrie Stillwell, Western Environmental Law Center, Eugene, OR, Nathaniel S.W. Lawrence, Natural Resources Defense Council, San Francisco, CA, for plaintiffs-appellants.
 Albert M. Ferlo, Jr., Michael E. Wall, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, Lois J. Schiffer, Assistant Attorney General, Michael J. Yamaguchi, United States Attorney, Charles M. O'Connor, Assistant United States Attorney, Rose Miksovsky, Office of General Counsel, U.S. Department of Agriculture, San Francisco, CA, Roger Nesbitt, Office of the Solicitor, Pacific Northwest Region, United States Department of Interior, Portland, OR, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California; Maxine M. Chesny, District Judge, Presiding. D.C. No. C 95-0038-MMC.
 Before WOOD, Jr.,* RYMER and TASHIMA, Circuit Judges.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Northcoast Environmental Center ("NEC"),[1] along with several other environmental organizations, brought suit against the Secretaries of the Departments of Agriculture and Interior (collectively the "Secretaries") claiming the respective Secretaries failed to comply with the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. Plaintiffs claim that NEPA requires the Secretaries to prepare a programmatic environmental impact statement ("EIS"), or at least an environmental assessment ("EA"), for their inter-agency Port-Orford cedar ("POC") management plan. Plaintiffs also seek to enjoin logging restrictions and road closings within several Pacific Northwest forests containing stands of POC until the defendant Secretaries comply with their NEPA obligations and prepare an EIS. Finding there was no "final agency action" or, if there was, the action did not impact the environment, the district court granted defendants' motion for summary judgment and plaintiffs appealed. Because we agree with the district court, that there was no final agency action and that the POC management documents do not constitute major federal action affecting the environment, we affirm.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 A. The Port-Orford Cedar Fungus Problem
 
 2
 The POC is a valuable ecological and cultural component of forest ecosystems in southwest Oregon, northwest California, and inland populations in the Sacramento and Trinity River Basins. Phytophera lateralis ("fungus") is a pathogenic root rot fungus, fatal to infected POC. This fungus spreads and releases spores that are spread via roots, water, and moist infested soils. Human and animal activities facilitate the movement of the fungus over longer distances. Chronic fungus infection can occur in areas where trees have been killed in the past, and seedlings from natural regeneration may become infected as well. Activities such as road construction and maintenance, off-road vehicle use, timber harvest, mining, livestock grazing, hiking, and commercial cedar bough and mushroom collection in infested areas, and surface water movement present a risk of spreading the fungus.
 
 B. The Forest Service's Response
 
 3
 In 1987 the United States Department of Agriculture's Forest Service ("FS"), Regions 5 and 6, formed an Inter-regional Coordinating Group comprised of FS experts and representatives from the National Forests and the United States Department of the Interior's Bureau of Land Management ("BLM"). The Coordinating Group's goals included: (1) developing a coordinated inter-regional POC management program; (2) monitoring, evaluating and fine tuning the program; (3) recommending public and agency education programs; and (4) identifying and recommending research requirements, proposals and policies on the management of POC to the two Regional Foresters. The Coordinating Group developed a plan to accomplish these tasks entitled the POC Action Plan.
 
 
 4
 The POC Action Plan was developed by the Coordinating Group in response to the Forest Service's concern, and that of the public, for a comprehensive and integrated approach to managing POC in the presence of the fungus disease. The Plan covers four main areas of concern: (1) inventory and monitoring; (2) research and administrative study; (3) public involvement and education; and (4) management. The management section of the POC Action Plan identifies the following tasks:
 
 
 5
 (1) Continue to refine and update risk assessment model used in evaluating projects.
 
 
 6
 (2) Develop strategies for the management of the following activities:
 
 
 7
 -- Timber sales
 
 
 8
 -- Road construction and management
 
 
 9
 -- Reforestation and stand management
 
 
 10
 -- Other potentially earth moving activities in stands where a significant component is Port-Orford cedar
 
 
 11
 (3) Develop a system or method for sharing information.
 
 
 12
 In June 1988, the FS's Regional Foresters for Regions 5 and 6 approved and signed the POC Action Plan. Challenging the FS's failure to prepare an EIS prior to adoption and implementation of the POC Action Plan, NEC appealed the Agency's adoption of the POC Action Plan on August 18, 1988. Responding to NEC's appeal in a letter dated March 29, 1989, the Regional Foresters declared that under NEPA the POC Action Plan did not require an EIS because the Plan did not provide for specific actions, but merely represented "the beginning of a planning process." On October 20, 1989, NEC's appeal was denied by the Deputy Chief of the FS, who stated: "[t]he action plan does not represent a specific proposal with environmental consequences that can be meaningfully evaluated at this time." NEC then filed a complaint requesting injunctive and declaratory relief with the district court, challenging the FS's decision not to prepare an EIS. On March 19, 1991, following the district court's denial of NEC's request for a temporary restraining order, NEC voluntarily dismissed the action.
 
 
 13
 In October 1993, after reviewing the status and accomplishments of tasks under the Action Plan, members of the Coordinating Group found that 85% of the action items had been completed. In the fall of 1994, the FS reorganized the Coordinating Group into two teams: a POC Oversight Team, to make decisions on budgeting and prioritization of research and administrative projects, and a Technical Team, to share information, develop research and administrative projects, and provide technical advice. Following April, 1995 meetings, the Coordinating Group determined that the majority of the Action Plan's items had been accomplished and the POC Oversight Team notified the Regional Foresters of Regions 5 and 6 that the Action Plan had been completed and could be concluded.
 
 C. The Bureau of Land Management Response
 
 14
 The BLM completed its own POC Management Guidelines on October 5, 1994. These Guidelines contain management objectives, implementation strategies, measures for timber sale and service contracts to minimize spread of the fungus, and specifications for equipment washing and cleaning. The Guidelines provide lists of fungus control strategies and timber sale and service contract mitigation measures to be applied after site-specific NEPA analyses. Several BLM Resource Management Plans ("RMPs") include references to the POC Management Plan in their EIS statements regarding POC resource management. The Oregon Natural Resources Council ("ONRC"), a plaintiff in this case, protested the BLM's alleged failure to consider the alternatives of prohibiting logging and road building in uninfected watersheds to prevent the spread of the fungus in its EISs. The BLM denied ONRC's protests.
 
 D. Procedural History
 
 15
 Plaintiffs filed this suit against the Secretaries on January 5, 1995. Their two count complaint sought declaratory and injunctive relief under both NEPA, 42 U.S.C. § 4321 et seq., and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 et seq. Count II, which contained the NFMA claim, was voluntarily dismissed and is not at issue in this appeal. After consolidating cross-motions for summary judgment and defendants' motion to strike plaintiffs' exhibits, the district court ruled for the Secretaries on both motions. On October 23, 1996 the district court entered judgment for the Secretaries as to Count I. NEC then timely filed this appeal on November 4, 1996.
 
 II. DISCUSSION
 
 16
 NEC raises two issues on appeal. First, it claims that the district court judge abused her discretion by improperly striking certain documents submitted by NEC. Next, NEC claims that the district court erred, as a matter of law, in finding that NEPA did not require the Secretaries to prepare an EIS for their inter-agency POC management program.
 
 A. Stricken Agency Documents
 
 17
 NEC contends that the district court erred by striking its exhibits. NEC presents two arguments for including its exhibits: (1) the general rule limiting judicial review to the administrative record does not apply where plaintiffs challenge an agency's refusal to prepare an EIS in the first instance, and (2) the documents submitted by plaintiffs fall within well-established exceptions to the rule limiting judicial review to the administrative record. The Secretaries, on the other hand, counter that NEC failed to show that its exhibits were considered by agency officials with decision-making authority at the time the POC Programs were developed and that several of NEC's exhibits postdate the completed FS Action Plan and BLM Management Guidelines. Moreover, while acknowledging that "several narrow circumstances" allow consideration of extra-record material, the Secretaries claim that NEC failed to establish how any of its exhibits qualify for any of the exceptions. The Secretaries also contend that even if exclusion of the exhibits was improper their exclusion was merely harmless error because the district court previously concluded that the exhibits would have no impact on its decision.
 
 
 18
 While realizing that it was authorized to look beyond the administrative record, the district court declined to do so for three reasons. First, the court found that it was unnecessary to go beyond the record to determine whether the POC Program was a final agency action. Next, the court reasoned that it was unnecessary to go beyond the administrative record to decide whether the adoption of the Action Plan and Guidelines triggered NEPA procedures. Finally, finding that many of the Plaintiffs' exhibits duplicated material already found in the agency record, the court struck these exhibits as cumulative.
 
 1. Standard of Review
 
 19
 We review the district court's decision to exclude extra-record evidence for an abuse of discretion. Southwest Center for Biological Diversity v. U.S. Forest Service, 100 F.3d 1443, 1447 (9th Cir.1996).
 
 2. Extra-record Evidence
 
 20
 We allow consideration of extra-record materials in four circumstances: (1) if necessary to determine "whether the agency has considered all relevant factors and has explained its decision," (2) "when the agency has relied on documents not in the record," or (3) "when supplementing the record is necessary to explain technical terms or complex subject matter," and (4) "when the plaintiffs make a showing of agency bad faith." Southwest Center, 100 F.3d at 1450. NEC arguably points to the second exception when they state that the excluded exhibits "are agency documents concerning the POC Program and were, as evident from the documents themselves, 'considered' in defendants' decision." NEC claims that it is both "necessary and appropriate for plaintiffs to supplement the record with additional agency documents evidencing the existence, nature, and scope of the agency's actions."
 
 
 21
 Judicial review of agency action is generally limited to review of the administrative record. See 5 U.S.C. § 706; Animal Defense Council v. Hodel, 840 F.2d l432, 1436 (9th Cir.1988). However, where the issue is alleged agency inaction, we believe the scope of review in cases, such as this one, is broader, particularly where the issue is whether an agency's activities have triggered NEPA's procedures. A broader scope of review is necessary because there will generally be little, if any, record to review. Because NEPA is essentially a procedural statute, an agency's actions under NEPA are generally reviewed to determine if the agency observed the appropriate procedural requirements. LaFlamme v. F.E.R.C., 852 F.2d 389, 399 (9th Cir.1988) citing 5 U.S.C. § 706(2)(D).
 
 
 22
 Although it certainly would have been proper for the court to consider Plaintiffs' exhibits, the district court did not abuse its discretion when it struck the documents at issue. As the district court correctly noted, judicial review of an agency decision not to issue an EIS is generally limited to review of the administrative record at the time the decision was made. See Friends of the Earth v. Hintz, 800 F.2d 822, 829 (9th Cir.1986). Furthermore, the district court found some of the documents cumulative of those already in the agency record, and made an independent inquiry into whether the exhibits might prove outcome determinative and decided that they did not. The district court succinctly points out, "the real issue is not the POC Program's existence as such, but whether it constitutes a 'final agency action' for purposes of the Administrative Procedure Action." It was not necessary to go beyond the administrative record to decide whether the FS POC Action Plan and the BLM POC Management Guidelines triggered NEPA procedures. Thus, we find it was not an abuse of discretion for the district court to strike cumulative and unnecessary documents outside the administrative record. Furthermore, since the district court actually considered the stricken documents in making its decision, the plaintiffs suffered no prejudice by their exclusion.
 
 B. NEPA
 
 23
 NEC appeals the district court's order finding the defendant agencies reasonably concluded that the challenged activities did not trigger NEPA procedures. The crux of NEC's position is that the inter-agency POC program, comprised of the FS Action Plan and the BLM Management Guidelines, constitutes major federal action requiring a programmatic EIS under NEPA.
 
 
 24
 Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), requires "to the fullest extent possible," that "all agencies of the Federal Government" shall:
 
 
 25
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on-
 
 
 26
 (i) the environmental impact of the proposed action,(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 
 
 27
 (iii) alternatives to the proposed action,
 
 
 28
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 
 
 29
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 30
 This section describes the requirements for an EIS. The EIS is "a procedural obligation designed to assure that agencies give proper consideration to the environmental consequences of their actions." Merrell v. Thomas, 807 F.2d 776, 777-78 (9th Cir.1986), cert. denied, 484 U.S. 848, 108 S.Ct. 145, 98 L.Ed.2d 101, (1987). The EIS also ensures that the public is informed about the environmental impact of proposed agency actions. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989). An EIS need only be prepared for a major federal action having a significant impact on the human environment. Bicycle Trails Council of Marin v. Babbitt, 82 F.3d 1445, 1466 (9th Cir.1996). The Supreme Court has interpreted the human environment to mean the "physical environment-the world around us, so to speak." Id. citing Metropolitan Edison, 460 U.S. at 772-73, 103 S.Ct. at 1560-61.
 
 1. Standard of Review
 
 31
 This court reviews de novo the district court's grant of summary judgment upholding an agency decision. Natural Resources Defense Council v. U.S. Dept. Of Interior, 113 F.3d 1121, 1123, citing Southwest Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1447 (9th Cir.1996). Normally, the appropriate inquiry is whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Resources Ltd., Inc. v. Robertson, 35 F.3d 1300, 1304 (9th Cir.1993), quoting Section 706 of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).
 
 
 32
 The parties disagree as to the correct standard of review in analyzing the agency's decision not to conduct an EIS or EA for their POC related activities. Relying on Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), the Secretaries argue that the appropriate standard is "arbitrary and capricious." NEC, relying on Friends of the Earth v. Hintz, asserts that the appropriate standard of review is the less deferential standard of "reasonableness." 800 F.2d 822, 836 (9th Cir.1986) (An agency's decision that a particular project does not require preparation of an EIS is to be upheld unless it is unreasonable.). Although reliance on Friends of the Earth is dubious given the Supreme Court's subsequent holding in Marsh, subsequent appellate decisions narrow the impact of Marsh with respect to threshold questions of NEPA's applicability to particular agency activities.
 
 
 33
 In Marsh, the Supreme Court held that substantive NEPA decisions by an agency are reviewed under the arbitrary and capricious standard. In particular, the Court held that, where an agency had already conducted an environmental assessment, whether the agency need conduct an EIS is reviewed under an arbitrary and capricious standard. Id. at 376-77, 109 S.Ct. at 1860-61. Under the arbitrary and capricious standard, this court will only overturn an agency's decision if the agency committed a "clear error of judgment." California Trout v. Schaefer, 58 F.3d 469, 473 (9th Cir.1995). In making this inquiry, the question is whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." Id., quoting Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy, 898 F.2d 1410, 1414 (9th Cir.1990).
 
 
 34
 The circuit courts disagree as to Marsh 's breadth. In Goos v. I.C.C., the Eighth Circuit declined to interpret Marsh broadly. 911 F.2d 1283, 1292 (8th Cir.1990). The Goos court held that Marsh does not control when dealing with the threshold question of NEPA applicability in the first instance. Similarly, in Sierra Club v. Lujan, the Tenth Circuit also adopted a narrow interpretation of Marsh, finding threshold NEPA determinations governed by the reasonableness standard of review. 949 F.2d 362, 367 (10th Cir.1991). In contrast, the Eleventh Circuit found Marsh broadly applicable to agency actions involving NEPA, stating: "[i]n Marsh v. Oregon Natural Resources Council, the Supreme Court considered the question of judicial review under NEPA and explicitly rejected the reasonableness standard.... We, therefore, adopt the arbitrary and capricious standard when reviewing agency action in NEPA cases; if the agency action was not arbitrary and capricious, it should not be set aside." North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1538 (11th Cir.1990).
 
 
 35
 The Ninth Circuit follows the narrower application of Marsh found in Goos and Sierra Club. See Greenpeace Action v. Franklin, 14 F.3d 1324, 1331 n. 6 (9th Cir.1992) (Marsh distinguishable from cases which turn on the legal meaning of "significant" and whether established and uncontested historical facts presented by the administrative record satisfy this standard). We said in Greenpeace that Marsh required the application of the "arbitrary and capricious" standard when reviewing factual disputes between an agency and petitioners. 14 F.3d at 1331. However, we declined to resolve the appropriate standard for primarily legal challenges. Id. We addressed that issue directly in Alaska Wilderness Recreation & Tourism v. Morrison, 67 F.3d 723 (9th Cir.1995). In Alaska we stated: "[w]e find that it makes sense to distinguish the strong level of deference we accord an agency in deciding factual or technical matters from that to be accorded in disputes involving predominantly legal questions." Id. see also Price Rd. Neighborhood Ass'n v. U.S. Dept. Of Transp., 113 F.3d 1505 (9th Cir.1997) (Finding that two standards govern the review of agency actions involving NEPA, one being the "reasonableness" standard adopted in Alaska for legal disputes.).
 
 
 36
 Here, we have a threshold question of NEPA applicability. The Secretaries have not prepared an EIS or EA for their POC related documents and activities, contending that NEPA does not apply. We agree with the district court that this case involves primarily legal issues-whether certain FS and BLM activities triggered NEPA's procedural requirements-based upon undisputed historical facts. We hold the less deferential standard of "reasonableness" applies to threshold agency decisions that certain activities are not subject to NEPA's procedures.
 
 2. Plaintiffs' NEPA Claim
 
 37
 According to NEC, the Secretaries' failure to complete a programmatic EIS for the POC program is a final agency action subject to judicial review under the APA. NEC contends that the POC program is analogous to other federal, interregional disease control and timber management programs for which the FS and BLM have prepared programmatic EISs. Since the agencies determined that an EIS was not required for the POC program and the agencies' site-specific EISs merely refer to the larger POC program as providing guidance for dealing with the POC fungus disease problem, NEC believes that the Secretaries' POC program will effectively circumvent the requirements of NEPA. Thus, NEC claims that the agencies have effectively shielded their POC program from NEPA's EIS requirement for major federal actions significantly affecting the quality of the human environment.
 
 
 38
 The Secretaries, on the other hand, characterize their POC related activities as mere preliminary research and development efforts, unreviewable under the APA because the activities are not final agency actions. They contend that neither the FS Action Plan nor the BLM Management Guidelines are proposals for major federal action significantly affecting the environment. In support, the Secretaries assert that these documents are merely "research, development, and information-gathering tool[s] intended to lay the groundwork for later decision making." They further argue that these documents were circulated for informational purposes only and neither require nor call for any specific actions. The Secretaries conclude that since the "POC program" and the individual activities comprising the program do not call for the commitment of resources, NEPA's EIS requirement is not triggered.
 
 
 39
 Agreeing with the Secretaries, the district court found that the POC Program itself was not a final agency action subject to review and that even if the Action Plan and Guidelines constituted final agency actions, individually, they did not trigger NEPA's requirement to prepare an EIS because they were not major federal actions significantly affecting the environment. The district court correctly determined that the "reasonableness" standard should apply because the issues before the court were primarily legal issues.
 
 
 40
 The district court found that the "POC Program" (the collective POC activities of defendants referred to by plaintiffs as the "POC Program") was not a final agency action and, thus, not subject to review. First, the court noted that Section 704 of the APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Noting that no specific statute authorized review, the district court determined that the plaintiffs must establish that the POC Program was a "final agency action" within the meaning of the APA. Relying primarily on Lujan v. National Wildlife Federation, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), the district court found that none of the various activities, referred to as the "POC Program," could be characterized as an agency action much less a "final agency action."
 
 
 41
 Section 10(a) of the APA, 5 U.S.C. § 702, provides for judicial review of agency actions if two requirements are met. National Wildlife Fed'n, 497 U.S. at 882, 110 S.Ct. at 3185. First, the claimants must identify an "agency action." Id. "Agency action" includes the failure to act. Id. citing 5 U.S.C. § 551(13). Where, as here, the review is sought under the general review provisions of the APA the agency action must be "final agency action." Id. citing 5 U.S.C. § 704. Second, the plaintiffs must establish they have suffered a legal wrong, or will be adversely affected or aggrieved within the meaning of a relevant statute. Id. at 883, 110 S.Ct. at 3186. Only the first requirement is at issue here.
 
 
 42
 NEPA requires federal agencies to prepare an EIS for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Thus, NEPA places three requirements on actions subject to its procedures. The action must (1) be federal, (2) "major", and (3) have a significant environmental impact. An EIS is not necessary where a proposed federal action would not change the status quo. National Wildlife Federation v. Espy, 45 F.3d 1337, 1343 (9th Cir.1995), citing Upper Snake River v. Hodel, 921 F.2d 232, 235 (9th Cir.1990).
 
 
 43
 In many ways, a programmatic EIS is superior to a limited, contract-specific EIS because it examines an entire policy initiative rather than performing a piecemeal analysis within the structure of a single agency action. Ass'n of Pub. Agency Customers v. Bonneville Power Administration, 126 F.3d 1158, 1184 (9th Cir.1997). However, NEPA does not require an agency to consider the environmental effects that speculative or hypothetical projects might have on a proposed project. See Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (Finding NEPA inapplicable to a series of studies on the impact of resource development activities in the "Northern Great Plains" because they were meant only "to gain background environmental information for subsequent application in the decision making process with respect to individual coal-related projects."). Long-range aims are quite different from concrete plans and specific undertakings such as the FS's Land and Resource Management Plans and the BLM's Resource Management Plans which the Secretaries have submitted for purposes of environmental analysis under NEPA. See Id. NEPA does not require an agency to consider the environmental effects that speculative or hypothetical projects might have on a proposed project. Id.
 
 
 44
 With respect to NEPA, National Wildlife Federation is the seminal case for purposes of resolving the inter-related issues of ripeness and "final agency action." 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695. In National Wildlife Federation, plaintiffs challenged the BLM's land withdrawal review program, claiming the BLM violated NEPA by failing to provide an EIS for the program. Unable to find concrete effects required for APA review, the Court stated: "the term land withdrawal review program (which as far as we know is not derived from any authoritative text)[2] does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." Id. at 890-91, 110 S.Ct. at 3189. The Court found that, although frustrating for plaintiffs, a case-by-case approach was necessary to attack broad ill-defined programs that do not cause concrete effects. Id. at 894, 110 S.Ct. at 3191-92. Continuing, the Court found the BLM program was not ripe for judicial review until "the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." Id. at 891, 110 S.Ct. at 3190.
 
 
 45
 NEC argues that Lujan and Kleppe are inapposite here because the POC program is more than just a broad program with general application. They claim the POC program is a region-wide program that calls for specific control strategies and mitigation measures. NEC cites to two Ninth Circuit cases, Idaho Conservation League v. Mumma, 956 F.2d 1508 (9th Cir.1992), and Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346 (9th Cir.1994), in support of its proposition that it may challenge the overall POC plan and is not limited to challenging site-specific actions.
 
 
 46
 In Idaho Conservation League v. Mumma, 956 F.2d 1508 (9th Cir.1992), an environmental group challenged the FS's plan for managing over two million acres of the Idaho Panhandle Forest and the plan's accompanying EIS as violating NEPA. Distinguishing Idaho from National Wildlife Federation, the court stated that "the fundamental difference [between the two cases] is that the [plaintiff] is not challenging an entire program ... but rather their implementation in a particular instance." Id. at 1519. Since the decision complained of related to a specific plan to utilize the Idaho Panhandle Forest the agency action was "clear and final." Id. Thus, the suit was found ripe for review. Id.
 
 
 47
 In Salmon River, a citizens group sought review of a Forest Service reforestation program which proposed extensive use of herbicides. 32 F.3d at 1348-51. There, the Forest Service argued that a challenge to the impact statement would not be ripe until the Forest Service authorized a specific herbicide application. Id. at 1355. Relying on Idaho Conservation League v. Mumma, the Salmon River court rejected the Forest Service's position to the extent the impact statement set guidelines for future herbicide applications. Id. However, unlike National Wildlife Federation, the Forest Service treated the reforestation program as a discrete agency action.
 
 
 48
 Although our decisions in Idaho Conservation and Salmon River support NEC's contention that plaintiffs need not wait to challenge a specific project when their grievance is with an overall plan, those decisions are distinguishable from the present case. Neither of those cases involved threshold decisions of NEPA applicability. In both of those cases, NEPA challenges were brought to EISs already prepared for specific FS forest plans. See Salmon River, 32 F.3d at 1355 (Plaintiffs' NEPA challenge to a Forest Service reforestation plan providing for herbicide applications was reviewable before the Agency authorized a specific herbicide application because the plan called for discrete agency action.) and Idaho Conservation, 956 F.2d at 1519 (Deciding the case was ripe for adjudication because plaintiffs "were not challenging an entire program, or 'rules of general applicability,' ... but rather their implementation in a particular instance.").
 
 
 49
 Although it is a close call, we think the situation here is more analogous to that found in National Wildlife Federation and Kleppe. The district court properly recognized that none of the activities allegedly comprising the POC Program had an "actual or immediately threatened effect" as required by Lujan, 497 U.S. at 894, 110 S.Ct. at 3191. Moreover, the district court correctly decided that the defendants reasonably found that neither the FS POC Action Plan nor the BLM Management Guidelines "significantly affect the quality of the human environment." The FS Action Plan's "Action Items/Objectives" section does not create activities which impact the physical environment. Rather, the Action Items/Objectives set forth guidelines and goals for POC research, management strategies and information sharing. They do not provide for specific activities with a direct impact on POC. Similarly, BLM's POC Management Guidelines provide management strategies and goals for dealing with POC preservation and timber sales on BLM managed land. The Guidelines neither propose any site-specific activity nor do they call for specific actions directly impacting the physical environment. Therefore, we find the Secretaries reasonably decided that an EIS was not required for their POC management programs.
 
 
 50
 We share NEC's concern that agencies conduct full NEPA analysis when specific POC management plans are implemented or proposed. However, we do not believe the current POC programs call for specific enough action to trigger NEPA's procedural requirements nor do we believe that the "catch-22" argument, advanced by NEC, prevents effective review of agency actions effecting POC. There is no reason plaintiffs cannot challenge the sufficiency of an agency EIS when a discrete agency action is called for. The agencies will be unable to shield their POC program from NEPA review because they will not be able to avail themselves of the Council on Environmental Quality's "tiering" provision. 40 C.F.R. § 1502.20 ("Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions and to focus on the actual issues ripe for decision at each level of environmental review.") Although CEQ procedures allow agencies to incorporate by reference certain materials to cut down on the bulk of an EIS, they cannot "tier" their site-specific EISs to the broader POC program where the program itself has not been subject to NEPA procedures. See 40 C.F.R. §§ 1502.20-21. Furthermore, the Secretaries have stated their intentions to prepare an EIS when they propose to implement particular control strategies with environmental impacts. As we stated in Salmon River, judicial estoppel will prevent the Secretaries from arguing they have no further duty to consider their POC management policies when site-specific programs are challenged. 32 F.3d at 1357-58. "We assume that government agencies will ... comply with their NEPA obligations in later stages of development." Id. at 1358 (internal quotation omitted).
 
 III. CONCLUSION
 
 51
 The district court properly limited its review of the Secretaries' decision to the administrative record and found that the Secretaries' decision not to prepare an EIS was reasonable. Accordingly, the decision of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 Plaintiffs are collectively referred to as NEC
 
 
 [2]
 Similarly, this appears to be the case for the "POC Program" identified here, although, NEC points collectively to agency documents, the FS Action Plan and the BLM Management Guidelines, as comprising the "POC Program."