**BARRICK GOLDSTRIKE MINES INC., Appellant,**

v.

**Carol M. BROWNER, et al., Appellees.**

No. 99–5298.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 8, 2000.

Decided June 16, 2000.

Richard E. Schwartz argued the cause for appellant. With him on the briefs was Thomas C. Means.

Todd S. Kim, Attorney, U.S. Department of Justice, argued the cause for the federal appellees. With him on the brief were Lois J. Schiffer, Assistant Attorney General, Mary F. Edgar and Andrew C. Mergen, Attorneys.

Before: EDWARDS, Chief Judge; RANDOLPH and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

This is an appeal from the judgment of the district court dismissing the complaint

of Barrick Goldstrike Mines Inc. The case arises under § 313 of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11023. EPCRA requires certain types of facilities that "manufactured," "processed" or "otherwise used" listed "toxic chemicals" in amounts exceeding specified thresholds to report "releases" of these chemicals by July 1 of each year to the Environmental Protection Agency. *Id.* § 11023(b)(1). EPA uses the information to administer a "toxic release inventory" program pursuant to EPCRA. The program makes the toxic release information public. Although the toxic release inventory program originally applied only to manufacturing facilities, EPA extended it by regulation to several other industry groups, including metal mining. *See* 62 Fed.Reg. 23,834 (1997). Barrick mines gold and other precious metals in Nevada. The company alleges that in applying the program to mining, EPA in fact revised the program; that its revisions were substantive; that they were not made through rulemaking, as they should have been; and that the revisions were made instead through statements in "rulemaking preambles" and in detailed directives issued in the form of "guidance" and a letter. Brief of Appellant Barrick at 4. On EPA's motion the district court dismissed the complaint for lack of jurisdiction and because it was not ripe. The court issued no written opinion.

EPCRA contains no judicial review provision. Barrick therefore invoked the district court's general federal question jurisdiction (28 U.S.C. § 1331) and sought, pursuant to the Administrative Procedure Act (5 U.S.C. §§ 701–706, and 28 U.S.C. § 2201), a declaratory judgment that the three EPA actions were contrary to law. As to jurisdiction, the question is whether Barrick has challenged "final agency action" within the meaning of the APA, *see* 5

U.S.C. § 704. As to ripeness, we must determine whether Barrick, like the drug manufacturers in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), but unlike the cosmetics companies in *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), must change its conduct or risk costly sanctions, and whether the issues presented in Barrick's complaint are suitable for review at this time. *See Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1204–05 (D.C.Cir.1998).

1. Barrick claimed that for certain mining operations, including its own, EPA had revised the so-called *de minimis* exception set forth in 40 C.F.R. § 372.38(a) without conducting a rulemaking. Barrick moves waste rock. The rock contains trace concentrations of listed substances—toxic chemicals—including copper, nickel, silver and other metalbearing minerals. Under EPA's *de minimis* regulation, if a toxic chemical in a mixture amounts to less than 1% (or in the case of a carcinogen, less than 0.1%) the substance is not counted as having been released and does not count toward the manufacturing, processing or "otherwise used" threshold. *Id.* In EPA's "Metal Mining Facilities" guidance, posted on EPA's website in January 1999,[1] the agency stated that the chemicals in waste rock are not eligible for this *de minimis* exception because waste rock is not "manufactured, processed or otherwise used." Office of Pollution Prevention and Toxics, EPA, EPCRA Section 313 Industry Guidance: Metal Mining Facilities 3–28 (Jan.1999) [hereafter "1999 Guidance"].

▮▮▮▮ Counsel for EPA admitted at oral argument that EPA's position on the application of the *de minimis* exception to waste rock is final. If Barrick does not conform to EPA's view in fulfilling its re-

---

1. The guidance went through several iterations from 1997 to 1999, some of which were published in the Federal Register. *See, e.g.,* 62 Fed.Reg. 63,548 (1997). According to Barrick, the January 1999 version is "com-

prehensive and authoritative" and represents the agency's principal set of reporting instructions for mining companies. Brief of Appellant Barrick at 5.

porting obligation it will be subject to an enforcement action and fines. Even without counsel's concession, the finality of EPA's position is clear enough. That the issuance of a guideline or guidance may constitute final agency action has been settled in this circuit for many years. *See, e.g., Better Gov't Ass'n v. Department of State,* 780 F.2d 86, 92–96 (D.C.Cir.1986); *Ciba-Geigy Corp. v. EPA,* 801 F.2d 430, 435 & n. 7, 436 (D.C.Cir.1986). In *Better Government* we rejected the proposition that if an agency labels its action an "informal" guideline it may thereby escape judicial review under the APA. 780 F.2d at 93. In *Ciba–Geigy* we held that a letter from an agency official stating the agency's position and threatening enforcement action unless the company complied constituted final agency action. 801 F.2d at 436–39, 438 n. 9. In *Appalachian Power Co. v. EPA,* 208 F.3d 1015, 1020–23 (D.C.Cir.2000), we held again that a guidance document reflecting a settled agency position and having legal consequences for those subject to regulation may constitute "final agency action" for the purpose of judicial review. For finality to be found in these cases two conditions had to be satisfied: "First, the action must mark the 'consummation' of the agency's decision-making process, *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948)—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow,' *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970)." *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Here there is no doubt that EPA will refuse to apply the *de minimis* exception to Barrick's waste rock and that its refusal to do so has legal consequences— namely, that Barrick is bound to keep track of its movement of waste rock and report the movements as releases of toxic substances.[2]

 As against this EPA contended at oral argument that the 1999 Guidance changed nothing; that EPA had already taken the position Barrick complains about in the preamble to the rule subjecting the mining industry to the toxic reporting program; and that Barrick should have aimed its complaint at the preamble, but had not done so. There are three reasons for rejecting this line of reasoning.[3] First, EPA never made the argument in its brief in this court. *See, e.g., Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983). It did not even cite the page or pages in the preamble that supposedly support its position. Second, Barrick did indeed challenge EPA positions expressed in the preambles (Complaint ¶ 25; Brief at 4) and did so in a timely fashion because no statute of limitations applied. Third, we have recognized that final agency action may result "from a series of agency pronouncements rather

2. EPA's 1999 metals mining guidance commanded: "you must report ... the waste rock." 1999 Guidance, at 3–28. Other portions of the 1999 Guidance, not challenged in this case, are framed as recommendations.

3. EPA's brief contained a quite different argument—namely that the 1999 Guidance was not final because it was not "binding" and it was not binding because it merely explained "EPA's current view of how the statutory and regulatory requirements of the [toxic reporting] program apply to the metal mining industry and do not impose any binding new requirements." Brief for Federal Appellees at 16. It appears that EPA has abandoned this line of argument in light of our intervening decision in *Appalachian Power Co. v. EPA.* If it has not, if EPA still wishes us to consider the argument despite the quite different position it took at oral argument, we reject it for the reasons given in *Appalachian Power,* 208 F.3d at 1020–23. There is not the slightest doubt that EPA directed regulated entities to comply with the 1999 Guidance regarding their treatment of waste rock, *see supra* note 1, and the other two interpretations Barrick protests—conversion of one metal compound into another within the same compound category, and impurities in dore, *see infra* pp. 49–50.

than a single edict." *Ciba-Geigy*, 801 F.2d at 435 n. 7. Hence, a preamble plus a guidance plus an enforcement letter from EPA could crystallize an agency position into final agency action within APA § 704's meaning. Fairly read, this is what Barrick's complaint alleges.[4]

■ We also agree with Barrick that this aspect of its case is ripe for judicial review. The questions presented are purely legal.[5] Nothing we can imagine happening would bring the issues into greater focus or assist in determining them. And there is certainly the prospect of hardship to Barrick. Its only alternative to obtaining judicial review now is to violate EPA's directives, refuse to report releases involving waste rock, and then defend an enforcement proceeding on the grounds it raises here. In that respect the case is indistinguishable from *Ciba-Geigy Corp. v. EPA*, 801 F.2d at 438–39, in which we held an analogous claim ripe for judicial review.

■ 2. Barrick's second claim deals with whether it is "manufacturing" a "toxic chemical" when, in the course of extracting gold from ore, trace amounts of naturally occurring metal compounds change form, generally from metal sulfides to metal oxides. In the 1999 metals mining guidance, EPA announced that it would treat these changes as the manufacturing of toxic chemicals, a reportable event. *See* 1999 Guidance, at 3–11. Barrick objects that the 1999 Guidance is inconsistent with § 313(c) of the statute and 40 C.F.R. § 372.65(c), which do not permit the agency to treat as "manufacturing" the conversion of one metal compound into another within the same compound category. No

further detail is needed to understand why there is final agency action here and why this claim is ripe. Here too, EPA counsel conceded at oral argument that the position on this subject expressed in the 1999 Guidance is the agency's final position. The 1999 Guidance itself (at 3–11) says just that:

> Metal mining facilities should be aware of chemical conversions that may take place during beneficiation. The following types of conversions constitute manufacturing:
>
> • Conversion of one metal compound to another within the same compound category. For example, a lead mine may convert galena (lead sulfide in ore) to lead oxide during beneficiation.

Thus, if Barrick refuses to abide by the 1999 Guidance, the company will be subject to an enforcement action.

■ 3. Barrick's third and last claim relates to the fact that its mine produces metal bars—dore—that are gold and silver but also contain tiny amounts of naturally occurring elements and compounds from rock, compounds and elements that EPA lists as "toxic chemicals." Under the statute, "the term process means the preparation of a toxic chemical, after its manufacture, for distribution in commerce." 42 U.S.C. § 11023(b)(1)(C)(ii). Barrick thus believes that a "toxic chemical" cannot be "processed" unless it has first been "manufactured." From this it concludes that in producing its dore it has not processed toxic chemicals and therefore has no reporting obligation under the statute. EPA's opposite conclusion, Barrick contends, is embodied in its statement in the preamble to the 1997 rule expanding cov-

---

4. In a case (unlike this one) in which our jurisdiction was restricted to reviewing final "regulations," we held that a statement in a preamble to a *proposed* rule could not be reviewed. *See Florida Power & Light Co. v. EPA*, 145 F.3d 1414, 1418–20 (D.C.Cir.1998); *see also Molycorp, Inc. v. EPA*, 197 F.3d 543 (D.C.Cir.1999).

5. Barrick claimed not only that EPA had issued a substantive rule without engaging in rulemaking but also that it had misinterpreted its regulation (40 C.F.R. § 372.38(a)) and had acted arbitrarily by saying, with respect to the *de minimis* exception, that waste rock is not manufactured, but saying elsewhere that all "chemicals which exist in nature have been 'manufactured' at some point," 62 Fed.Reg. at 23,857.

erage to the mining industry, in the 1999 Guidance and in a letter, dated March 18, 1999, from the Chief of EPA's Toxic Release Inventory Branch to another mining company. The preamble states that the term "manufacture" is not limited to human activity. "Manufacture" of a toxic chemical includes its "production" and "EPA interprets 'production' to include creation." 62 Fed.Reg. at 23,857. Thus, according to the preamble "chemicals which exist in nature have been 'manufactured' at some point." *Id.* The 1999 Guidance states the same conclusion without giving the reasoning:

> Non-Target Metals and Metal Compounds. When processing the target metals and metal compounds at your facility, the ore you are beneficiating may also contain other non-target EPCRA Section 313 metals and metal compounds. If any portion of these non-target metals and metal compounds remain in the metal concentrate distributed into commerce, you must consider them toward the processing threshold of 25,000 pounds. If the EPCRA Section 313 chemicals are completely removed from your product prior to distribution into commerce, the chemicals are not considered processed and do not have to be considered toward the processing threshold.

1999 Guidance, at 3–15. The March 18, 1999, "guidance" letter from the branch chief also states the same conclusion. In order to comply with EPA's interpretation, Barrick claims that in 1999 it wound up reporting that it had " 'processed' the naturally occurring metal impurities that it could not completely remove from its dore." Reply Brief of Appellant Barrick at 21.

Nothing in EPA's brief or in its oral argument indicates that the EPA's position on this subject is tentative. The March letter is firm and conclusive, as is the 1999

Guidance. Both state what must be done to comply with EPA's toxic release inventory program. Legal consequences flow from the position expressed—Barrick must keep records and report to EPA unless it wishes to risk an enforcement action. That the agency action is embodied in interpretative statements in a rulemaking preamble, in a guidance document, and in a letter from a branch chief is not disqualifying. As we have said, the final agency action in *Ciba-Geigy*, 801 F.2d at 436 n. 8, consisted of a "series of steps taken by EPA" culminating in a letter from an EPA official stating the agency's position.[6] We have no doubt that EPA, in responding by letter to industry inquiries, assists companies in bringing themselves into compliance. But it scarcely follows that a company may not obtain judicial review of the agency's interpretation of the statute or regulation. There is of course the matter of timing. We have already decided that the first two objections Barrick raised are ripe for review and we see no basis for ruling any differently on this claim. It too presents a pure question of law and withholding review has sufficient adverse effects on Barrick's business.

For the reasons stated, the judgment of the district court is reversed and the case is remanded for further proceedings.

*So ordered.*

---

**6.** The final agency action in *Her Majesty the Queen v. EPA*, 912 F.2d 1525, 1530–32 (D.C.Cir.1990), consisted of a letter from an EPA official reiterating the agency's interpretation of a provision in the Clean Air Act.