**BARRICK GOLDSTRIKE MINES, INC., Plaintiff,**

v.

**Christine T. WHITMAN and United States Environmental Protection Agency, Defendants.**

**No. Civ.A.99–958 TPJ.**

United States District Court, District of Columbia.

April 2, 2003.

---

*MEMORANDUM AND ORDER*

JACKSON, District Judge.

Plaintiff Barrick Goldstrike Mines, Inc., ("Barrick") brings this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, to review certain administrative actions taken by defendant the United States Environmental Protection Agency ("EPA") under sections 313(b) and 328 of the Emergency Planning and Community Right–to–Know Act of 1986 ("EPCRA"), 42 U.S.C. §§ 11023(b) and 11048. Specifically, Barrick asserts that EPA unlawfully expanded the definitions of two statutory terms and contracted the scope of a regulatory exemption by the devices of a guidance document, agency letter, and preambles to agency rulemakings without following formal rulemaking procedures, the effect of which is to require Barrick to make public report of significant increases in the amounts of "toxic chemicals" released in conjunction with its goldmining operations. EPA asserts that its "interpretative guidance" of the EPCRA and its own regulation warrants deference, is reasonable, and is consistent with past practice and rulemakings, and that formal rulemaking is unnecessary. Presently before the Court are parties' cross-motions for summary judgment for declaratory relief.[1]

### I.

Section 313 of EPCRA requires certain facilities that manufacture, process or otherwise use chemicals on the Toxic Release Inventory ("TRI") list to submit annual reports to the EPA and state officials. 42 U.S.C. § 11023(b)(1)(A). These reports must contain information about whether the facility manufactures, processes, or otherwise uses listed "toxic chemicals," an estimate of the maximum amounts of each listed chemical present at the facility at any time, methods of disposal or treatment of waste, and an estimate of the amount of each toxic chemical entering the "environment." 42 U.S.C. § 11023(g). The EPA

---

1. The D.C. Circuit has held that the issues are ripe for judicial review. *See Barrick Gold- strike Mines, Inc. v. Browner,* 215 F.3d 45 (D.C.Cir.2000).

compiles the data from these reports into a computer database and makes it accessible to the public. 42 U.S.C. § 11023(j). The purpose of the TRI program is "to inform persons about releases of toxic chemicals to the environment; to assist governmental agencies, researchers, and other persons in the conduct of research and data gathering; and to aid in the development of appropriate regulations, guidelines, and standards. . . ." 42 U.S.C. § 11023(h).

Initially, the TRI reporting requirements applied to facilities having ten or more employees and belonging to certain manufacturing industries specified in Standard Industrial Classification ("SIC") Codes. 42 U.S.C. § 11023(b)(1)(A). Facilities so designated are required to file TRI reports if they "manufactured, processed or otherwise used" a toxic chemical. *Id.* To manufacture is "to produce, prepare, import, or compound a toxic chemical." 42 U.S.C. § 11023(b)(1)(C)(i). The term "process" means "the preparation of a toxic chemical, after its manufacture, for distribution in commerce." 42 U.S.C. § 11023(b)(1)(C)(ii).

On May 1, 1997, after proper notice-and-comment procedures, the EPA promulgated a final rule adding seven new industry groups to the list of facilities subject to the TRI reporting program. 62 Fed.Reg. 23,-834 (May 1, 1997). One of the newly included industry groups was metal mining, thereby expanding the reporting program to include Barrick's mining facility. Starting with the July 1, 1999, reporting deadline, Barrick was required to submit reports concerning its mining activities to the EPA pursuant to section 313 of EPCRA.

Nearly a decade earlier EPA had issued its final rule implementing section 313 of the EPCRA in February, 1988. 53 Fed. Reg. 4500 (Feb. 16, 1988). This rule established an exemption (the "*de minimis* exemption") allowing facilities to disregard certain minimal concentrations of toxic chemicals in mixtures or other trade name products when making TRI reporting determinations. *See* 40 C.F.R. § 372.38(a); 53 Fed.Reg. 4500, at 4504, 4509. If a toxic chemical is present in a mixture or trade name product at levels below 1 percent, or 0.1 percent if the chemical is a carcinogen, a facility is generally not required to account for those quantities in its TRI reporting. 40 C.F.R. § 372.38(a).

Plaintiff Barrick is a Colorado gold mining corporation that has been mining gold and other precious metals at two mines (collectively making up the "Goldstrike Project") in north-central Nevada since 1913. Burke Decl. ¶ 4. The gold mining process, Barrick explains, begins by removing soil and rocks from the mines. *Id.* at ¶ 5. The rock contains only naturally occurring substances, including trace concentrations of gold and other minerals, some of which are listed as "toxic chemicals" under the EPCRA. *Id.* Barrick keeps only the ore, *i.e.* rock from which gold may be economically extracted. *Id.* at ¶ 6. The ore Barrick has recovered over the past three years had less than 1 percent (and less than .1 percent of those known to be a carcinogen) of metal compounds listed as toxic chemicals with one exception: the ore did contain approximately .2 percent of a carcinogenic arsenic compound. *Id.* at ¶¶ 8–9; Supplemental Burke Decl. at ¶ 16.[2]

---

**2.** Rock that Barrick removes from a mine but does not use any further is referred to as "waste rock." Burke Decl. at ¶ 8–9. Barrick transports waste rock to another location at the mine site, reshapes the rock to conform to the natural surroundings, and revegetates the area. *Id.* The waste rock displaced as recently as 1998 was similarly innocuous insofar as its toxic chemical content. *Id.* at ¶ 8.

Barrick then crushes and grinds the ore into the consistency of facial powder and mixes it with water to create an "ore slurry." Burke Decl. at ¶ 10. The ore slurry is put through an autoclave to oxidize the minerals in order to free gold, silver, and mercury from the crystalline structure of the pulverized rock. *Id.* After autoclaving, the ore slurry is mixed with a diluted cyanide solution with which the gold, silver, and mercury combine. *Id.* at ¶ 11. Those minerals are then absorbed onto activated carbon from which they later may be removed from the ore slurry. *Id.* at ¶ 12.

The remaining ore slurry, called "tailings," contains trace quantities of many minerals, some of which are categorized as "toxic chemicals" under the EPCRA. *Id.* Similar to the ore from which it originated, however, the tailings too, typically contain less than 1 percent (or less than .01 percent for a carcinogen) of metal compounds listed as toxic chemicals, again with the single exception of certain arsenic compounds. *Id.* Barrick permanently places the tailings in a lined impoundment designed to ensure their containment. *Id.* at ¶ 13.

After separating out the mercury,[3] Barrick makes the gold and silver into a product called "dore," (pronounced "dor-AY"), which it then pours into metal bars and distributes in commerce. *Id.* at ¶¶ 14–15. The dore is predominantly gold and silver but also contains impurities, including elements and compounds that are listed as "toxic chemicals" under the EPCRA. *Id.* at ¶ 15.

In conjunction with its promulgation of the 1988 final regulation implementing section 313 of the EPCRA and establishing a *de minimis* exemption, the EPA has attempted to assist facilities in meeting their reporting obligations by issuing preambles to the 1988 and 1997 rulemakings, as well as various guidance documents, and letters responding to specific questions about interpreting the 1988 regulation. The EPA's publication known as "EPCRA Section 313 Industry Guidance: Metal Mining Facilities" (hereinafter "Metal Mining Guidance"), issued in January, 1999, and a letter from Maria Doa, Chief of EPA's Toxic Release Inventory Branch (hereinafter "the Doa letter") on March 18, 1999, are examples, and are particularly significant with respect to the issues in this case. None of these interpretive documents was issued pursuant to formal APA rulemaking process.

Barrick complains that the EPA used these documents to improperly modify the TRI reporting requirements without the appropriate APA formalities by altering the scope of the *de minimis* exemption and the meaning of two statutory terms ("manufacture" and "process"). Specifically, plaintiff argues that:

(1) EPA has used guidance documents and non-contemporaneous preamble statements to exclude "waste rock" and "tailings" from the *de minimis* exemption;

(2) EPA has used guidance documents to expand the statutory definition of "manufacturing" a "toxic chemical" to include changes in mineral compounds that remain the same "toxic chemical," and

(3) EPA has used guidance documents to expand the statutory definition of "process[ing]" to include impurities remaining in the doray produced for distribution in commerce.

Barrick contends that the explicit language of the *de minimis* exemption applies to its waste rock and tailings, but

---

**3.** Barrick sells the mercury separately.   Burke Decl. at ¶ 14.

EPA's preambles and guidance documents appear to exclude these materials. Accordingly, Barrick is prevented from applying the *de minimis* exemption to ignore, for reporting purposes, *de minimis* amounts of naturally occurring minerals in the rock that it mines. Barrick argues that EPA's expansive interpretations of the terms "manufacturing" and "processing" formulated outside the APA rulemaking process also impermissibly subjects Barrick's mining activities to TRI reporting.

## II.

The parties' cross-motions for summary judgment effectively seek declaratory relief concerning the following three questions: (1) whether the *de minimis* exemption applies to plaintiff's waste rock and tailings; (2) whether existing toxic metal compounds that change in chemical composition during plaintiff's process are "manufactured" under the EPCRA, and (3) whether plaintiff's extraction and beneficiation[4] of precious metals involves the "processing" of toxic chemicals under the EPCRA. Because the legal standards for questions (2) and (3) are largely the same, they will be analyzed together.[5]

*The De Minimis Exception*

■ In February 1988, the EPA established the *de minimis* exemption to TRI reporting when it issued a final rule implementing Section 313 of the EPCRA. *See* 53 Fed.Reg. 4500 (February 16, 1988).

Because the language of the exemption is central to the issue at hand, the Court will cite it in full here:

> If a toxic chemical is present in a mixture of chemicals at a covered facility and the toxic chemical is in a concentration in the mixture which is below 1 percent of the mixture, or 0.1 percent of the mixture in the case of a toxic chemical which is a carcinogen as defined in 29 CFR 1910.1200(d)(4), a person is not required to consider the quantity of the toxic chemical present in such mixture when determining whether an applicable threshold has been met under § 372.25 or determining the amount of release to be reported under § 372.30. This exemption applies whether the person received the mixture from another person or the person produced the mixture, either by mixing the chemicals involved or by causing a chemical reaction which resulted in the creation of the toxic chemical in the mixture. However, this exemption applies only to the quantity of the toxic chemical present in the mixture. If the toxic chemical is also manufactured (including imported), processed, or otherwise used at the covered facility other than as part of the mixture or in a mixture at higher concentrations, in excess of an applicable threshold quantity set forth in § 372.25, the person is required to report under § 372.30. This exemption does not apply to toxic chemi-

---

4. Beneficiation is the treatment of raw materials (as iron ore) to improve the physical or chemical properties especially in preparation for smelting. Merriam–Webster's Collegiate Dictionary 106 (10th ed.2000).

5. A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). The moving party bears the burden of persuasion. *See Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). While disputes over facts that may affect the outcome of a case will properly preclude an entry of summary judgment, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the parties in this case agree that there are no genuine issues of material fact and the issues can be decided as a matter of law.

cals listed in § 372.28, except for purposes of § 372.45(d)(1).

40 C.F.R. § 372.38(a).

Intending to provide "a step-by-step guide to compliance with EPCRA Section 313," EPA issued its Metal Mining Guidance in January, 1999. *See* Metal Mining Guidance at iv. The guidance document states that waste rock and tailings are not eligible for the *de minimis* exemption. With respect to waste rock, the Metal Mining Guidance provides that:

> Because waste rock is not manufactured, processed, or otherwise used, amounts of EPCRA Section 313 chemicals in waste rock are not eligible for the *de minimis* exemption. Therefore, if you exceed a threshold for an EPCRA Section 313 chemical that is also present in waste rock, you must report the disposal or other waste management of the waste rock on the chemical's Form R, regardless of concentration.

Metal Mining Guidance at 3–28. Similarly, the Metal Mining Guidance addresses tailings as follows:

> Metal mining facilities may coincidentally manufacture EPCRA Section 313 chemicals as byproducts during beneficiation. For example, a cobalt mine extracts ore containing arsenic. During beneficiation, arsenic compounds in the ore convert to other arsenic compounds, which the facility removes and manages as waste. The facility coincidentally manufactured arsenic compounds as a byproduct, and the *de minimis* exemption does not apply to threshold determinations and release and other waste management reporting for the manufactured arsenic compounds.

*Id.*

Barrick contends, however, that EPA's more restrictive interpretation of the applicability of the *de minimis* exemption in the Metal Mining Guidance does not comport with the plain meaning of the text of the published regulation, which applies the *de minimis* exemption to any mixture. 53 Fed.Reg. at 4509 (*de minimis* exemption "applies to all mixtures"). Barrick claims that because its waste rock and tailings are mixtures that contain *de minimis* concentrations of toxic chemicals, they may be excluded from TRI reporting under the *de minimis* exemption. Barrick further argues that the EPA is attempting to improperly issue new "rules" in the form of guidance documents rather than through the required rulemaking. In the event of a conflict between the promulgated rules (the 1988 regulation) and informal policies, the rules govern. Relying on *Christensen v. Harris County,* 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), Barrick states that EPA's interpretation of its own regulation is entitled to deference only when the regulation is ambiguous. Therefore, Barrick argues that the portions of the EPA guidance documents that are inconsistent with an unambiguous reading of the *de minimis* exemption should be held unlawful and set aside. *See* 5 U.S.C. § 706(2).

EPA counters that its interpretation was established through the 1988 rulemaking and consistently applied in the challenged interpretive statements to the mining industry. EPA cites the preamble to the 1988 rule—found in the Federal Register, but not published in the Code of Federal Regulations—which asserts that the *de minimis* exemption applies to "all mixtures or trade name products imported, processed, or otherwise used at the facility," but continues to state that the *de minimis* exemption "does not apply to the byproducts produced coincidentally as a result of manufacturing, processing, use, waste treatment, or disposal." 53 Fed. Reg. at 4501, 4509. Tailings and waste rock fall outside the scope of the *de min-*

*imis* exemption, according to the EPA, because unlike impurities that remain in the ore slurry, the tailings are "by-products" separated from the mixture and therefore not eligible for the *de minimis* exemption.

▆▆▆ At issue here, therefore, is the authoritative quality of the EPA's interpretation of a regulation. In general, an agency's interpretation of its own regulation is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *see also Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n,* 212 F.3d 1301, 1303 (D.C.Cir.2000). However, such deference "is warranted only when the language of the regulation is ambiguous." *Christensen,* 529 U.S. at 588, 120 S.Ct. 1655. To the extent that an interpretation of a regulation is a "nonobvious" or "unanticipated" reading, it is deemed a legislative rule that can only be promulgated through notice-and-comment rulemaking. *See National Family Planning & Reproductive Health Ass'n v. Sullivan,* 979 F.2d 227, 235 (D.C.Cir.1992).

The EPA construes the *de minimis* exemption to include a requirement that the mixture in question derive from a "threshold activity" (i.e., manufactured, processed, or otherwise used) to qualify for exclusion from the required reporting. The Court concludes such a reading is inconsistent with the explicit language of the regulation, which imposes no such requirement. The regulation is not ambiguous as to the issue; it is simply silent. Notwithstanding the conspicuous absence of any explicit mention of a "threshold activity" requirement, the EPA states that the following language supports its position:

> However, this exemption applies only to the quantity of the toxic chemical present in the mixture. If the toxic chemical

> is *also manufactured (including imported), processed, or otherwise used at the covered facility* other than as part of the mixture or in a mixture at higher concentrations, in excess of an applicable *threshold quantity* set forth in § 372.25, the person is required to report under § 372.30.

40 C.F.R. § 372.38(a) (emphasis added). EPA contends that the phrase "also manufactured (including imported), processed, or otherwise used at the covered facility" indicates that a mixture must be involved in a threshold activity to qualify for the exemption in the first instance; otherwise, the phrase "also manufactured ... at the covered facility" would be unnecessary.

This interpretation, however, is at best a nonobvious reading of the regulation. The plain (and obvious) meaning of the language above indicates that the exemption (1) applies to a toxic chemical found in a mixture, (2) does not apply to a toxic chemical initially found in a mixture but then manufactured, processed, or otherwise used at a facility in something other than a mixture, and (3) does not apply to mixtures having toxic chemical concentrations in excess of the applicable threshold of the exemption.

Under the EPA's interpretation, the word "also" would have no effect, by effectively eliminating the exemption's recognition of toxic chemicals that exist in an exempted mixture that are later "also" manufactured, processed, or used *other than* as part of that or any other mixture. Indeed, to give full effect to the word "also" (which unlike the phrase "threshold activity" actually appears in the exemption), the exemption must be read to apply generally to all mixtures at a facility. Any toxic chemical present in a mixture which subsequently undergoes a threshold activity and exists in a non-mixture must be reported.

Both parties also rely on selective portions in the preamble to the 1988 rule, as contained in the Federal Register. In particular, one portion of the preamble states that:

> any listed toxic chemical that is present in a mixture below these *de minimis* concentrations does not have to be factored into the threshold or release determinations by the facility. This exemption applies to all mixtures or trade name products imported, processed, or otherwise used at the facility.

53 Fed.Reg. 4500, 4509. Barrick argues that the first sentence indicates that the *de minimis* exemption applies to "any" listed toxic chemical, irrespective of whether it is involved in a threshold activity. In contrast, EPA relies on the second sentence to argue that the *de minimis* exemption applies only to certain threshold activities (i.e., mixtures or trade name products imported, processed, or otherwise used at a facility). Although the second sentence does not mention "manufactured" products, EPA presumably does not construe this sentence to exclude mixtures that are "manufactured" from the exemption. Indeed, the preamble contemplates applying the exemption to the manufacturing of a chemical mixture beyond that of simply importing the mixture. *Id.* Thus, it would be inconsistent for the EPA to argue that the second sentence limits the exemption

to certain threshold activities, when it also recognizes that the preamble speaks to other manufactured mixtures eligible for the exemption. Even if the preamble was intended to limit the exemption to mixtures "imported, processed, or otherwise used" at the facility, however, this interpretation would conflict with the plain language of the regulation. In such cases, the regulation must govern.[6]

The court finds that the regulatory language concerning the exemption is clear—a mixture need not have been involved in a "threshold activity" to be eligible for the exemption. Because the preamble to the 1988 rulemaking is inconsistent with the plain language of the regulation, *see Auer,* 519 U.S. at 461, 117 S.Ct. 905, it is invalid. Accordingly, subject to the concentrations of toxic chemicals it contains, Barrick's waste rock may be eligible for the *de minimis* exemption.

■ Unlike EPA's position concerning waste rock, the Court concludes that its interpretation that tailings fall outside the scope of the *de minimis* exemption is consistent with the language of the regulation. In reviewing the potential applicability of the exemption to tailings, the overriding consideration is whether the tailings qualify as a "mixture" under the exemption.[7] Once again, this Court must first consider

---

6. The EPA suggests that the EPA's legal rationale for the regulatory creation of a *de minimis* exemption is the doctrine of *de minimis non curat lex*—"the law does not concern itself with trifling matters"-necessarily implies that the exemption be truly *de minimis.* The EPA believes that the regulation will not be *de minimis* if waste rock can be included in the exemption. While the EPA may be correct that it could only create a *de minimis* exemption that is truly *de minimis,* if the EPA intended a "threshold activity" requirement as part of the *de minimis* exemption, it should have included that language in the regulation, not inferred it later from its absence.

7. Unlike the tailings issue, the court's consideration of whether waste rock is eligible for the *de minimis* exemption does not involve the question of whether the waste rock is a "mixture" for purposes of the regulation. The defendant concedes that waste rock is a mixture by asserting that "if Plaintiff were to process the waste rock at some future point," *de minimis* amounts of toxic chemicals in the waste rock would be exempt from reporting under the regulation. *See* Def's Cross Mot. at 42.

whether the language of the regulation is ambiguous. If so, EPA's interpretation is entitled to deference unless it is "plainly erroneous" or "inconsistent with the regulation." *See Auer*, 519 U.S. at 461, 117 S.Ct. 905.

The language of the *de minimis* exemption, in relevant part, provides:

> This exemption applies whether the person received the mixture from another person or the person produced the mixture, either by mixing the chemicals involved or by causing a chemical reaction which resulted in the creation of the toxic chemical in the mixture. However, this exemption applies only to the quantity of the toxic chemical present *in the mixture*. If the toxic chemical is also manufactured (including imported), processed, or otherwise used at the covered facility *other than as part of the mixture* or in a mixture at higher concentrations, in excess of an applicable threshold quantity set forth in § 372.25, the person is required to report under § 372.30.

40 C.F.R. § 372.38(a) (emphasis added).

EPA submits that the tailings are a by-product that are not present *in* the mixture. Instead, they are separated from the mixture (i.e., the ore slurry) when separated from the metals sought to be processed. The EPA characterizes tailings as consisting of toxic chemicals that are "also manufactured (including imported), processed, or otherwise used at the covered facility *other than as part of the mixture.*" In the preamble to the 1988 final rule, the EPA documented this interpretation and distinguished between "impurities" that remain in the mixture and "by-products" that are separated from a mixture [8]-the later being ineligible for the *de minimis* exemption.

In contrast, Barrick characterizes the tailings as a separate mixture [9] under the EPCRA, asserting that "nothing in EPA's regulations precludes one 'mixture' from being 'separated' from another 'mixture.'" Pl's Surreply at 6 n. 6. The plaintiff concludes that as a separate mixture, the tailings are independently eligible for the *de minimis* exemption, assuming all other requirements are met.

The mere fact that both parties have proffered plausible interpretations of the regulatory language as it applies to tailings suggests that the regulation is truly ambiguous. If read in isolation, the definition of mixture is arguably broad enough to include the tailings. The language of the exemption, however, also explicitly recognizes that toxic chemicals can be a part of something other than a mixture. Given this ambiguity, the Court must defer to the EPA, unless its interpretation is plainly erroneous or inconsistent with the regu-

---

**8.** EPA further argues that the regulation's definitions of "manufacture" and "mixture," when considered in conjunction with the language in the *de minimis* regulation, supports its characterization of the tailings as "by-products" separate from any mixture. In particular, the definition of "manufacture" includes a "toxic chemical that is produced coincidentally during the manufacture, processing, use, or disposal of another chemical or mixture of chemicals, including a toxic chemical that is separated from that other chemical or mixture of chemicals as a by-product, and a toxic chemical that remains in that other chemical or mixture of chemicals as an impurity." 40 C.F.R. § 372.3. Although Barrick criticizes the defendant's reliance on other portions of the regulation to assist in interpreting the practical scope of the definition of mixture within the *de minimis* exemption, the plaintiff's approach relies exclusively on a overly broad interpretation of the definition of mixture, notwithstanding other language in the regulation.

**9.** The regulation defines mixture as "any combination of two or more chemicals, if the combination is not, in whole or in part, the result of a chemical reaction."

lation. *See Auer*, 519 U.S. at 461, 117 S.Ct. 905. As revealed above, the EPA's characterization of the tailings as a by-product (i.e., something manufactured other than a mixture) is not plainly erroneous or inconsistent with the regulatory language. Accordingly, the Court upholds the EPA's interpretation with regard to this issue.

Having done so, the Court must now determine whether EPA's interpretation should have been made through the APA's notice and comment rulemaking procedures. Interpretive rules do not require notice and comment rulemaking so long as the interpretation is within the scope of the regulatory and statutory language. *See American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1113 (D.C.Cir.1993). In this case, the interpretation of the *de minimis* exemption as applied to tailings is within the scope of the regulation, which notes that the exemption applies to toxic chemicals present "in a mixture." Toxic chemicals removed from a mixture are no longer eligible for the exemption. As such, the Court concludes that notice and comment rulemaking was not required.

Based on the foregoing, the Court concludes that the EPA's exclusion of waste rock from the *de minimis* exemption does not comport with the language of the 1988 regulation, which is silent as to whether the substance must be involved in a "threshold activity." Because the tailings are removed from and not "present in a mixture," however, EPA's decision to exclude tailings for the *de minimis* exemption is proper and did not require compliance with notice and comment rulemaking.

*Statutory Definitions*

Barrick also claims that the EPA has unlawfully expanded the EPCRA definition of "manufacturing" to include an intra-category chemical change of a toxic chemical and the definition of "processing" to encompass the distribution of irremovable naturally-occurring impurities contained in the dore. Plaintiff asserts that these expansive interpretations of the statutory definitions violate the clear language of the statute, and, in any event, are valid only if issued via notice and comment rulemaking.

A court is required to give effect to an agency regulation that is a reasonable interpretation of an ambiguous statute. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If the statutory language is clear on its face, the Court's inquiry must stop there. *Id.* at 842–43, 104 S.Ct. 2778. If, however, the statute is ambiguous with respect to a particular issue, the Court must decide whether the agency's interpretation is a permissible construction of the statute. *Id.* at 843, 104 S.Ct. 2778. As previously stated, an agency's further interpretation of its own regulation is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" *See Auer*, 519 U.S. at 461, 117 S.Ct. 905.

The toxic chemicals subject to the requirements of the EPCRA are listed in title 40, section 372.65(c) of the Federal Code of Regulations. *See* 42 U.S.C. § 11023(c) (referencing the list now contained in the C.F.R.). The list contains both elements (e.g., copper) and chemical compounds consisting of multiple elements (e.g., copper sulfate). In some cases, all compounds of the same chemical are listed as one "chemical category." For example, all compounds of arsenic are considered one "chemical category" on the list. Each chemical category is a separate entry on the "toxic chemical" list and is considered a different "toxic chemical." Where a chemical category, rather than a single

element, makes up a reportable "toxic chemical," a person must aggregate the quantities of all of the different compounds that fall into that same chemical category and determine if the total amount meets the threshold quantity for reporting purposes.

The statutory definition of "manufacture" is "to produce, prepare, import, or compound a toxic chemical." 42 U.S.C. § 11023(b)(1)(C)(i). The 1988 rulemaking expanded this definition by adding the following sentence:

Manufacture also applies to a toxic chemical that is produced coincidentally during the manufacture, processing, use, or disposal of another chemical or mixture of chemicals, including a toxic chemical that is separated from that other chemical or mixture of chemicals as a byproduct, and a toxic chemical that remains in that other chemical or mixture of chemicals as an impurity.

40 C.F.R. § 372.3. The 1999 Metal Mining Guidance further elaborated on this definition, stating that the "conversion of one metal compound to another within the same compound category" may constitute "manufacturing." *See* Metal Mining Guidance at 3–11. The Metal Mining Guidance notes that the conversion of lead sulfide to lead oxide, both metal compounds that belong in the "lead" chemical category on the toxic chemical list, would constitute manufacturing. *See id.*

During the autoclaving step of gold extraction, trace amounts of arsenic sulfide become arsenic oxide. Burke Decl. ¶ 11. Barrick contends, however, that this "intra-category" transformation of one metal compound to another does not produce a "toxic chemical" because the two compounds belong to the same "chemical category" on the toxic chemical list. No new "toxic chemical" is created. Barrick contends that such intra-category changes are incidental and do not constitute the production, preparation, importation or compounding of a toxic chemical. Therefore, Barrick argues that EPA's interpretation conflicts with the language and structure of the EPCRA and is invalid. Finally, Barrick argues that even if this Court concludes that the EPA's interpretation is consistent with the EPCRA, the interpretation is a legislative rule and a "substantive legal addition" to the TRI program and therefore is void unless promulgated through notice-and-comment rulemaking. *See Appalachian Power Co. v. EPA,* 208 F.3d 1015, 1024 (D.C.Cir.2000); *Paralyzed Veterans of America v. D.C. Arena L.P.,* 117 F.3d 579 (D.C.Cir.1997).

EPA contends that its interpretation of "manufacture" to include all creation of any new chemical compounds within a listed chemical category is reasonable. The statutory definition of "manufacture" is silent as to how it should be applied to chemical categories, and EPA argues that its 1988 rule therefore defined manufacture to include all creation, including creations of chemical byproducts, impurities, or other chemicals. *See* 40 C.F.R. § 372.3. EPA asserts that because its interpretation is rational and advances EPCRA's objective of making more information about toxic releases publicly available, its interpretation is entitled to deference under both *Auer* and *Chevron.*

The statute broadly defines "toxic chemical" as "a substance on the list described in section [313(c)]." 42 U.S.C. § 11049(10). EPA contends that this definition is ambiguous with respect to the status of chemical *categories* that are listed because a category is not a "substance" but includes a number of substances. The 1988 rule clarifies the statutory definition of "toxic chemical" to encompass either the listed chemical or the listed chemical category.

EPA submits that it has jointly considered its interpretations of "manufacture" and "toxic chemical," each of which is a reasonable interpretation of ambiguous statutory language, and concluded that changes of chemicals from one chemical compound to another within the same chemical category of toxic chemicals constitute manufacturing that is reportable under the statute. The EPA has applied this interpretation consistently since a 1990 Question and Answer document and has adopted this approach in its response to comments in the 1997 notice and comment rulemaking that incorporated metal mining facilities in the TRI program. The EPA contends that its interpretation of the 1988 regulation is rational and serves the informative purpose of the EPCRA.[10]

Finally, EPA argues that its interpretation does no more than clarify a phrase in the 1988 regulations, consistent with its past practice; thus, its regulatory interpretation is not "legislative," and need not be made through notice and comment rulemaking. *See Paralyzed Veterans of America*, 117 F.3d at 588; *American Mining Congress*, 995 F.2d at 1112.

The Court finds that under the ambiguous language of both the statute and the regulation, the EPA's interpretation of "manufacture" to include intra-category changes is reasonable, and therefore entitled to deference under *Chevron* and *Auer*. Moreover, the EPA's interpretation is not a change to the statute that need have been made through notice and comment rulemaking. Even in an intra-category change, a toxic substance is "produced"

through the process of autoclaving the ore—an action that fits within the statutory definition of "manufacture."

Furthermore, the Court finds the EPA is consistent in its treatment of the term "toxic chemical." As in determining threshold quantities, the EPA considers elements making up a chemical category in the aggregate—if *any* of the substances belonging to the chemical category is manufactured, then the category as a "toxic chemical" has been manufactured. That one metal compound within a chemical category changes to another within the same category does not alter the end result: namely, a metal compound within a chemical category (and thus a "toxic chemical") has been produced.[11]

Finally, the Court concludes that the EPA's interpretation is not a legislative rule because it is a consistent elaboration on the definitions in the statute and regulation. A toxic chemical has been produced in the autoclave process. That it arose through an intra-category change as opposed to another method is irrelevant— the statute and the regulation recognize no such distinction. The EPA "arguably could have relied on the regulation itself" rather than on the Metal Mining Guidance to conclude that an intra-category changes was a "manufacture." *See Paralyzed Veterans of America*, 117 F.3d at 588. Therefore, the EPA was not required to follow the formal notice and comment rulemaking procedures.

■■■ The Court next turns its attention to plaintiff's challenge to the EPA's interpretation of "processing." In the DOA

10. EPA discusses at length the legislative history of the EPCRA, arguing that the EPCRA was intended to broaden the collection of information and should be read expansively.

11. The Court notes that while the issue at hand involves the EPA's interpretation of an ambiguous statute and regulation, were it to

apply the lowest level of deference given to agency interpretations of law contained in policy statements or opinion letters, the Court would still conclude that EPA's interpretation " 'as the power to persuade.' " *See Christensen*, 529 U.S. at 587, 120 S.Ct. 1655.

letter issued in March, 1999, EPA generally takes the position that if dore shipped from a mine contains any amount of a listed toxic chemical, then Barrick has "processed" the chemical, and the entire amount of that chemical in the process stream must be considered in making the threshold determinations. *See* Pl's Mem. Ex. C, Tab C, DOA Letter, at 2.[12] Barrick asserts that under this definition, because the dore contains unwanted trace amounts of certain impurities that Barrick is unable to fully remove, Barrick must report the entire amount of those chemicals, including the amounts that Barrick has removed and does not distribute in commerce. Because the EPA fails to assert (nor can the Court find) that the predicate act of "manufacturing" has occurred, the Court concludes that impurities contained within the ore mined by plaintiffs is not "processed" for purposes of the EPCRA.

The EPCRA defines "process" as:

[t]he preparation of a toxic chemical, after its manufacture, for distribution in commerce-

(I) in the same form or physical state as, or in a different form or physical state from, that in which it was received by the person so preparing such chemical, or

(II) as part of an article containing the toxic chemical.

42 U.S.C. § 11023(b)(1)(C)(ii). Barrick correctly argues and the EPA does not contest that under the statutory definition, a toxic chemical cannot be "processed" unless it has first been "manufactured," as defined by EPCRA. *See id.* Because naturally-occurring elements found in the ore (to include those qualifying as toxic chemicals under the EPCRA) are not produced, prepared, imported, or compounded, Barrick asserts that they are not "manufactured" within the meaning of the EPCRA. Barrick therefore concludes that because the impurities naturally occurring in the ore it mines have not been "manufactured" under EPCRA, they cannot be "processed" under EPCRA. The EPA in its preamble to the 1997 rulemaking takes a contrary position. The preamble states that because "production" includes creation by natural (and industrial) processes, even those chemicals existing in nature have been "manufactured" at some point. *See* 62 Fed.Reg. 23834, 23856–57 (May 1, 1997). This would include all chemicals (e.g., metals and impurities) naturally occurring in ores.[13] *Id.* Consistent with the 1997 rulemaking preamble, the EPA initially maintained in its summary judgment briefs that naturally-occurring metals and impurities in the ore were "manufactured" via natural processes. The EPA asserted that such impurities were thereafter "processed" (i.e., "prepared" for distribution in commerce) during both the extraction of the ore from the plaintiff's mines and beneficiated in preparation.[14] Since the filing of its briefs,

---

**12.** In relevant part, the letter states that "if any of the arsenic and/or other listed metal become part of that 1% of the dore that is not gold or silver ... then the entire quantity of arsenic and/or other listed metals added to the leach pad during the reporting year must be considered processed."

**13.** Plaintiff counters that this interpretation is absurd because something can only be "manufactured" in a deliberate act by a human being. To conclude otherwise would effectively hold the Creator responsible for reporting all toxic chemicals originating in nature.

**14.** Specifically, EPA claimed that:

[t]he extraction of ore containing a substance on the list of toxic chemicals constitutes 'preparation' of any toxic chemicals contained therein, including impurities, because it involves separating the toxic chemicals from its natural state for distribution in commerce; beneficiation involves further preparation of the toxic chemical in the ore

however, a federal district court judge in the District Court of Colorado has ruled that "naturally occurring undisturbed ores are not manufactured" within in the meaning of EPCRA. March 30, 2001 "Order of Clarification" in *National Mining Ass'n, et al. v. EPA*, Civ Action No. 97 N 2665 (D.Colo.) (clarifying a January 16, 2001, "Order and Memorandum or Decision").[15] The EPA has embraced the Colorado district court's decision and concomitantly abandoned in this case its argument that "toxic chemicals at plaintiff's mining facilities that remain in the ground, in their natural, undisturbed state, have been 'manufactured' by natural creative processes." Def's Notice of Supp.App. at 2. While the EPA correctly points out that the court's ruling in *National Mining* is limited in that it did not "address the issue of whether the term 'manufacture' includes extraction and beneficiation activities," *see National Mining*, Order of Clarification at 3, the Court finds its concession with regard to naturally occurring impurities to be dispositive of the issue now before it.

Having conceded that impurities occurring naturally in undisturbed ores are not "manufactured," the EPA offers no alternative legal theory by which the Court can find that the naturally-occurring impurities in the ore have been manufactured within the meaning of EPCRA. By its own admission, the "processing" of toxic chemicals is predicated upon their having been "manufactured." The EPA asserts only that the impurities in the ore are "processed" (after being manufactured) during extraction and beneficiation.

Absent further clarification by the EPA, this Court may have independently concluded that impurities in the mined ore are still "manufactured" during the extraction and/or beneficiation processes in that they are "prepared" within the meaning of the statutory definition. *See* 42 U.S.C § 11023(b)(1)(C)(i). The EPA, however, has foreclosed this interpretation of the statute by limiting the scope of the term "prepare" as it appears in the definitions of "manufacture" and "process." The EPA maintains that the term "prepare" in the definition of "manufacture" means "to create," while the same term means "to make ready" for purposes of "processing" under the EPCRA. Def's Memo in Supp. of EPA's Cross-mot Summ. J. at 33. Given this clarification, this Court can find no basis for concluding that Barrick has created and therefore "manufactured" the impurities contained in the ore.

Based upon the foregoing, the Court concludes that the EPA's interpretation that impurities occurring naturally in the

---

for such distribution. 62 Fed.Reg. 23,834, 23,857. This preparation occurs 'after [the chemical's] manufacture,' within the meaning of section 313(b)(1)(C)(i), for the metals contained in the ore have been manufactured" by natural processes, id.; thus, the extraction and beneficiation activities meet the definition of the statutory term "process."
Def's Memo in Supp. of EPA's Cross-mot Summ. J. at 24 (citing 42 U.S.C. § 11023(b)(1)(C)(ii)).

15. In relevant part, the court reasoned that: [t]he effect of EPA's interpretation of 'manufacture' is to write the words 'after its manufacture' out of the statutory definition of processing because, under EPA's interpretation, *all* materials in existence, toxic and otherwise, are manufactured. Such an interpretation is impermissible under the rules of statutory construction. *Knutzen v. Eben Ezer Lutheran Housing Center*, 815 F.2d 1343, 1348–49 (10th Cir.1987) (citation omitted) ("It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute.").
*National Mining Ass'n. v. Browner*, No. 97–2665, Order and Mem. of Decision, at 12 (D.Colo. Jan. 16, 2001).

ore Barrick mines have been "processed" is unreasonable in light of the clear statutory definition of "process," stating that a toxic chemical can only be processed after being manufactured. Therefore, to the extent that the EPA's guidance documents assert that the failure to remove these impurities during the processing of dore results in their having been processed for purposes of EPCRA, they contravene the statutory definition of "processing" and are invalid under the statute.

It is therefore, this 2nd day of April, 2003,

ORDERED, that plaintiff's motion for summary judgment [18] is granted in part and denied in part; and it is

FURTHER ORDERED, that defendant's cross-motion for summary judgment [22] is granted in part and denied in part; and it is

FURTHER ORDERED, that defendant's interpretation excluding plaintiff's waste rock from being eligible for the *de minimis* exemption is invalid; and it is

FURTHER ORDERED, that defendant's interpretation excluding plaintiff's tailings from being eligible for the *de minimis* exemption is valid; and it is

FURTHER ORDERED, that defendant's interpretation excluding plaintiff's tailings from being eligible for the *de minimis* exemption need not have been promulgated via notice and comment rulemaking; and it is

FURTHER ORDERED, that defendant's interpretation that an intra-category change of a toxic chemical falls within the definition of "manufacture" is valid; and it is

FURTHER ORDERED, that defendant's interpretation that an intra-category change of a toxic chemical falls within the definition of "manufacture" need not have been promulgated *via* notice and comment rulemaking; and it is

FURTHER ORDERED, that defendant's interpretation that plaintiff has "processes" naturally occurring impurities found in its dore is invalid; and it is

FURTHER ORDERED, that plaintiff's motion to amend the complaint [28] is denied without prejudice.