**FOREST SERVICE EMPLOYEES FOR ENVIRONMENTAL ETHICS, Plaintiff,**

v.

**UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture, Defendant.**

**No. CV 03–165–M–DWM.**

United States District Court, D. Montana. Missoula Division.

Sept. 30, 2005.

Timothy A. Bechtold, Rossbach Hart Bechtold, Missoula, MT, Charles M. Tebbutt, Western Environmental Law Center, Eugene, OR, Marc D. Fink, Western Environmental Law Center, Boise, ID, for Plaintiff.

William W. Mercer, Mark Steger Smith, Office of the U.S. Attorney, Billings, MT, Thomas L. Sansonetti, U.S. Department of Justice—E.N.R.D. General Litigation, Washington, DC, for Defendant.

## ORDER

MOLLOY, Chief Judge.

### I. Statement of Facts

**A. Background on wildfire and the FS use of chemical fire retardant**

Fighting wildfires is a prominent and expensive land management task: in 2001 the United States Forest Service (USFS) was appropriated $611 million for firefighter preparedness and $320 million to fight wildfires. In the 2003 fire season a total of 3.960,842 acres of federal, tribal, state and private lands were burned in over 63,269 wildfires. Following severe fire seasons between 1909 and 1934, the USFS began an aggressive policy to suppress all fires and to prevent human caused fires. From 1994–2001, the USFS fought an average of over 10,000 wildfires each year on national forests. The USFS considers chemical fire retardant an important tool in the USFS firefighting toolbox.

Though the USFS claims it uses chemical fire retardant in only a small percentage of wildfires, it uses an average of 15 million gallons of fire retardant annually, though as many as 40 million gallons have been used in some years. In FY 2003, 23,860,607 gallons of retardant were pumped into USFS, Bureau of Land Management (BLM), and state air tanker bases for a total of 18,725 aircraft loads. *Def's. State. of Uncontroverted Facts*, ¶ 36 (June 25, 2004). The vast majority of retardant is dumped by the USFS out of airplanes and helicopters. Each gallon of retardant is 85% water and 15% chemical fire retardant.

The USFS admits that chemical fire retardant can have adverse environmental effects, may be harmful to aquatic environments and can "adversely affect" other "forest resources," and that fire retardant has accidentally landed in streams resulting in fish kills. *Def's. State. of Genuine Issues*, ¶ 5 (July 30, 2004). During the period from August 2001 through December 2002, chemical fire retardant was dropped in water inhabited by endangered species eight times, six of which occurred on national forest lands. *Decl. of Alice Forbes* ¶¶ 38–39 (June 25, 2004).

The USFS admits that fire retardant has been accidentally dropped on firefighters, but states that investigations of such incidents revealed no health risks. *Def's. State. of Genuine Issues*, ¶ 7.

In the 1990's the USFS, U.S. Department of Agriculture (USDA), and the Department of Interior (DOI) began issuing various guidelines and policies concerning fire management. These guidelines and policies provide guidance on how to respond to fires once they occur and what tools are available to respond to wildfire. The USFS cites the following, among others, as the *national* guidelines and policies relating to fire management:

● Forest Service Manual 5100: provides overall guidance in fire management of the USFS. Chapter 60, section 51632 of the manual provides that the objective is to have available and utilize adequate types and quantities of qualified fire chemical products to accomplish fire management activities safely, efficiently and effectively.

● The USFS Guidelines for Aerial Delivery of Retardants or Foam Near Waterways: sets forth the operational standard that retardant is not to be dropped within 300 feet of water; it provides guidance for pilots to accomplish the objective and allows for emergency exceptions.

● Fireline Handbook: used by on-the-ground firefighters to guide suppression operations; it contains a section on the use of chemical fire retardant.

● Incident Response Pocket Guide: pocket sized reference guide containing guidelines and policies for fire suppression,

including the "Principles of Fire Retardant Application."

- Interagency Standards for Fire and Fire Aviation Operations 2004: Chapter 12 of this guide provides overall direction and guidance for retardant application, use and safety for firefighting personnel.

*Def's. State. of Uncontroverted Facts,* ¶ 29.

The USFS recognizes that these guidelines and policies are promulgated at the national level, but maintains that the guidelines for the manner in which fires are or will be managed and suppressed in a particular national forest are set forth in that forest's Land and Resource Management Plan (LRMP). The USFS also maintains that the ultimate decision to use chemical fire retardant is not a national decision, but a local decision made by the incident commander in charge of a particular fire. Plaintiff cites other evidence that the decision to allow the use of chemical fire retardant in fighting fires is a national decision. On March 28, 2000, the FS issued a Stop Work Order halting the use of chemical fire retardant containing sodium ferrocyanide on 46 of 75 interagency aerial retardant firefighting bases; this order was rescinded on April 20, 2000. *Def's. Statement of Uncontroverted Facts,* ¶¶ 38–40. The USFS also contracts for the purchase of fire retardant through National Retardant Contracts. *Id.* at ¶ 30. However, according to the USFS, the National Retardant Contracts do not require the agency to purchase fire retardant. *Second Decl. of Alice Forbes* ¶ 10 (July 30, 2004).

In April of 2000, the USFS developed the Guidelines for Aerial Delivery of Retardants or Foam Near Waterways (Guidelines), which prohibit application of chemical fire retardant within 300 feet of waterways.

**B. The USFS's Attempts at Endangered Species Act Consultation**

After the Guidelines were issued, the USFS asked the United States Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) to accept the interim use of the Guidelines through the 2000 fire season pending further study and consultation under Section 7 of the Endangered Species Act (ESA). The FWS and NMFS did so, but emphasized the "interim nature" of the Guidelines and the need for programmatic review of the environmental effects as soon as practicable. *Pl's. Statement of Uncontroverted Facts,* ¶ 13–14; *Def's. Statement of Genuine Issues,* ¶ 13–14. In October 2000, the USFS completed a Biological Assessment/Evaluation of the Guidelines, determining that their use until December 2001 "may affect but is not likely to adversely effect" threatened or endangered species. In response to a request from the USFS, the FWS and NMFS concurred that if the Guidelines were followed, adverse effects to threatened or endangered aquatic species were not likely, but also reminded the USFS of its earlier commitment to programmatic consultation and that the FWS/NMFS concurrence on the use of the Guidelines would cease on December 31, 2002. *Pl's Statement of Uncontroverted Facts,* ¶ 19; *Def's Statement of Genuine Issues,* ¶ 19. In 2003, the USFS began preparing a new Biological Assessment pursuant to Section 7 of the ESA. A USFS biologist indicated that the assessment would have reached a "likely to adversely affect" determination, but the USFS decided that there would not be formal consultation, despite the contrary advice of the USFS legal counsel. *Pl's Statement of Uncontroverted Facts,* ¶¶ 24, 31–32; *Def's. Statement of Genuine Issues,* ¶ 24, 31–32. The USFS has engaged in "emergency consultation" with the FWS in response to chemical fire retardant dumps in waterways inhabited by listed species and the spills were determined to have a

"May affect, likely to adversely affect" impact on listed species.

### C. The USFS's Attempts at NEPA Compliance

The USFS previously recognized the need to conduct NEPA analysis concerning the use of chemical fire retardant on national forests. The USFS admits that the DOI firefighting agencies suggested that the USFS should determine whether to conduct NEPA analysis on the Guidelines and that the USFS attempted to do some environmental analysis at the national programmatic level. *Def's. State. of Uncontroverted Facts*, ¶ 41. In 2000, the USFS in cooperation with the Council on Environmental Quality (CEQ), agreed to prepare an interim Environmental Assessment (EA) to address the new information concerning fire retardant and the interim Guidelines. The USFS also began preparing an Environmental Impact Statement (EIS) for the broader spectrum of retardants/foams etc; NEPA compliance was to be "a phased process beginning with this nationwide interim EA" and ending with future NEPA studies for any later issues regarding fire retardant use in the long term. *Pl's. State. of Uncontroverted Facts*, ¶¶ 15–16; *Def's. State. of Genuine Issues*, ¶¶ 15–16. In May of 2001, the "retardant EA" was completed and ready for signature; the EA recommended continued use of the Guidelines. However, the USFS did not sign the EA. The USFS says this was because it determined that "there is no proposal for major federal action related to the national action as to the use of chemical fire retardants." *Def's. State. of Uncontroverted Facts*, ¶ 42. Plaintiff cites USFS documents indicating that the decision not to sign the EA was made because there was no public scoping or involvement in the EA, and that the USFS recognized that even if the EA was

not signed, the USFS still needed to prepare the fire retardant EIS or EA. *Pl's. State. of Uncontroverted Facts*, ¶¶ 21–22. The USFS recognizes these statements, but attributes them to the "opinions of staff" in an "internal briefing paper" that "does not represent the agency's position." *Def's. State. of Genuine Issues*, ¶¶ 21–22. The USFS has still not signed the initial fire retardant EA, has not prepared the subsequent fire retardant EIS, and has never consulted NEPA concerning the use of chemical fire retardant on the national forests. *Pl's. State. of Uncontroverted Facts*, ¶ 23; *Def's. State. of Genuine Issues*, ¶ 23.

## II. Analysis

### A. Defendant and Defendant–Intervenor's Motions for Summary Judgment as to Claim 2

In its Complaint, Plaintiff claimed that the USFS's failure to involve the public and provide public notice of the Internal EA was arbitrary and capricious, an abuse of discretion, and contrary to law. *Pl's. Compl.*, ¶ 60 (October 14, 2003). In its opening brief, in the section entitled "Statement of the Questions To Be Decided," Plaintiff asked this Court to decide "Did the Forest Service violate NEPA by failing to involve the public and allow public comment on its 'internal' fire retardant EA?" *Pl's. Memo. In Support of Mot. for S.J.*, page 2 (June 25, 2004). However, in its response to Defendant and Defendant–Intervenor's Motions, Plaintiff acknowledges that the USFS "has never prepared and EA or an EIS." *Pl's. Response to Def. and Def.-Intervenor's Mots. for S.J.*, page 17 (July 30, 2004). Plaintiff's final reply brief does not address the issue, thus, this Court should grant Defendant and Defendant–Intervenor's Motions for Summary Judgment as to Claim 2 are granted.

**B. This Court should grant Plaintiff's Motion for Summary Judgment with regard to Claim 1 because the USFS decision to not prepare an EA or an EIS for the use of chemical fire retardant on national forests is unreasonable and a violation of NEPA.**

### 1. Background on NEPA

■ The National Environmental Policy Act (NEPA) requires that federal agencies such as the USFS carefully consider significant environmental impacts and provide relevant information to the public. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211 (9th Cir. 1998) (cert. denied by *Malheur Lumber Co. v. Blue Mountains Biodiversity Project,* 527 U.S. 1003, 119 S.Ct. 2337, 144 L.Ed.2d 235 (1999)). NEPA "imposes a procedural requirement that an agency must contemplate the environmental impacts of its actions." *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1149 (9th Cir.1998). "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that 'the agency will not act on incomplete information, only to regret its decision after it is too late to correct.'" *Blue Mountains Biodiversity Project,* 161 F.3d at 1211. (Quoting *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). NEPA is to be applied to "the fullest extent possible." *Jones v. Gordon,* 792 F.2d 821, 826 (9th Cir.1986); 42 U.S.C. § 4332. The legislative history behind this phrase provides: "[N]o agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance." *Jones,* 792 F.2d at 826.

■ NEPA requires USFS to prepare a detailed EIS for all "major federal actions affecting the quality of the human environment." *Id. (citing* 42 U.S.C. § 4332(2)©). An EIS must be prepared if "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor." *Blue Mountains Biodiversity Project,* 161 F.3d at 1212. To show that the USFS violated its duty to prepare an EIS, Plaintiff need not show that a significant effect will in fact occur, only that substantial questions are raised as to whether a project *may* have a significant effect. *Id.* (emphasis added).

Defendant and Defendant–Intervenors claim that the USFS cannot be compelled to prepare an EA or an EIS for the use of chemical fire retardant on national forests because 1) there has been no "final agency action" to trigger the Court's jurisdiction under the APA, and 2) there is no "major federal action significantly affecting the quality of the human environment" requiring compliance with NEPA.

### 2. There has probably been Final Agency Action under the APA

■ The Administrative Procedures Act (APA) entitles persons adversely affected by "agency action" to judicial review thereof. 5 U.S.C. § 702. If no other statute provides a cause of action, the agency action complained of must be *"final* agency action." 5 U.S.C. § 704 (emphasis added). Because NEPA does not have a citizen suit provision, there must be final agency action for this Court to have statutory jurisdiction under the APA

Under the APA, federal courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or other-wise not in accordance with law;" or "without observance of procedures required by law," 5 U.S.C. § 706(2)(A,D). Federal courts shall also "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Agency action "includes the whole or a part of an agency rule, order, license, sanction, relief,

or the equivalent or denial thereof, or *failure to act."* 5 U.S.C. § 551(13)(emphasis added).

Plaintiff seeks judicial review under § 706(2)(A,D) of the USFS decision to allow the use of chemical fire retardant to fight fires on national forests, without conducting a NEPA analysis (EA or EIS). Plaintiff argues that by failing to consult NEPA, the USFS is not following procedures required by law. Alternatively, Plaintiff challenges the FS's failure to prepare a NEPA document concerning its use of chemical fire retardant under § 706(1). Defendants and Defendant–Intervenors challenge this Court's jurisdiction for lack of "final agency action." They contend that Plaintiff seeks "wholesale improvement" of the USFS's firefighting procedures and that this type of "programmatic attack" is prohibited by *SUWA* and *Lujan*. However, the CEQ regulations governing NEPA specifically allow programmatic environmental impact statements:

> Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations (§ 1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

40 C.F.R. 1502.4(b). The USFS has been using chemical fire retardant for decades but has never prepared an EIS or consulted NEPA in any way.

■ The Ninth Circuit has held that an agency's decision not to prepare an EIS is a final agency action. *Hall v. Norton,* 266 F.3d 969, 975 n. 5 (9th Cir.2001); *see also Catron County Board of Commissioners, New Mexico v. United States Fish and Wildlife Service,* 75 F.3d 1429 (10th Cir. 1996) (Tenth Circuit rejects Secretary of Interior's claim that designation of critical habitat under the ESA was not subject to NEPA, finding the alleged failure to comply with NEPA was a final agency action). In *Hall,* plaintiff challenged the BLM's decision to exchange public land for private land, allowing housing development on formerly public land in the Las Vegas Valley. *Hall,* 266 F.3d at 972. The BLM issued a Finding of No Significant Impact (FONSI) claiming that the EA showed the land disposals would not significantly effect air pollution levels. *Hall,* 266 F.3d at 973. Hall challenged the sufficiency of the EA and asserted that the EA showed significant negative impact on air quality. *Hall,* 266 F.3d at 974. The court specifically held that the BLM's decision not to prepare an EIS was a final agency action. *Hall,* 266 F.3d at 975 n. 5. The only potential distinguishing factor in the present case is that here there has been no NEPA consultation whatsoever, whereas in *Hall,* the BLM conducted an EA and then issued a FONSI. Regardless, *Hall* suggests an agency's decision that NEPA is inapplicable is itself a final agency action.

■ The Supreme Court has held that two conditions are required for an agency action to be "final" under the APA: 1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature;" and 2) the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citations omitted).

As to the first condition, the decision to use fire retardant to fight fires on national forests without consulting NEPA has already been made. Plaintiff notes that the USFS's defense in this case shows that the USFS has no intention of revisiting its decision to use fire retardant or to consult NEPA.

Plaintiff FSEEE argues that the second condition for final agency action is met because: 1) FSEEE members have had fire retardant dropped directly on them and the materials safety data sheets counsel against retardant contact with the skin; 2) retardant drops in waterways can kill fish, resulting in adverse affects to FSEEE members' fishing experiences; and 3) USFS's decision not to consult NEPA has procedurally harmed them. *Pl's. Response to Def. Mot. for S.J.,* page 6 (July 30, 2004). In support of the third assertion, FSEEE cites *Citizens for Better Forestry v. U.S. Dep't. of Agriculture,* 341 F.3d 961, 971 (9th Cir.2003) for the proposition that "the harm consists of added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision on the environment. NEPA's object is to minimize that risk, the risk of uninformed choice." This contention comports with the purposes of NEPA to ensure informed governmental decisionmaking and allow for public comment. Defendant claims that Plaintiffs have not been harmed because the declarations filed in support of their motion are too "generalized" and "speculative."

In support of their argument that there has been no final agency action, Defendant and Defendant–Intervenors rely primarily on *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) and *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) (*SUWA*). The thrust of this argument is that *Lujan* and *SUWA* both rejected APA suits challenging a federal agency's decision not to prepare EIS for broad programs that are not site specific. Defendants seize upon language in those cases forbidding wholesale review of land management policy and requiring "frustrating" case-by-case approaches when challenging land management decisions. It is clear from these cases that the Supreme Court favors the "case-by-case" approach and limited judicial review under the APA. However, this case is unlike *Lujan* and *SUWA*.

In *Lujan,* plaintiffs challenged the BLM's general ongoing practice of reclassifying some public lands that were previously "withdrawn" from mineral leasing and mining activities. *Lujan,* 497 U.S. at 879, 110 S.Ct. 3177. The plaintiffs dubbed this practice, which comprised nearly 1250 individual land classifications and withdrawal revocations, including some that had not yet occurred, the "land withdrawal review program." The plaintiffs sought to use the APA to compel the BLM to produce a programmatic EIS to study the environmental impacts of the "land withdrawal review program." *Id.* According to the Court:

> The term "land withdrawal review program" (which as far as we know is not derived from any authoritative text) does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations. It is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the FLPMA.

*Lujan,* 497 U.S. at 890, 110 S.Ct. 3177. The Court prohibited the plaintiffs from seeking "wholesale improvement of the program by court decree" and required plaintiffs to challenge some "particular action that causes it harm." *Lujan,* 497 U.S. at 891, 110 S.Ct. 3177. The Court recognized that the "case-by-case" approach may be frustrating for environmental organizations, but that courts "intervene in the administration of the laws only when,

and to the extent that, a specific "final agency action" has an actual or immediately threatened effect." *Lujan,* 497 U.S. at 894, 110 S.Ct. 3177.

In *SUWA,* plaintiff environmental groups complained that the BLM had failed to take action to comply with various statutory mandates requiring the BLM to protect public lands in Utah from damage caused by off-road vehicles (ORVs). *SUWA,* 124 S.Ct. at 2378. The plaintiffs sought review under § 706(1) to compel "agency action unlawfully withheld or unreasonably delayed." The plaintiffs charged the BLM with a "failure to act." The Court noted that the APA insists on "agency action," either as the action complained of (§§ 702 and 704) [and 706(2) ] or the action to be compelled (§ 706(1)). *Id.* The Court held a failure to act is "sometimes remediable under the APA, but not always;" a claim under 5 U.S.C. § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take. SUWA,* 124 S.Ct. at 2379.

■ Defendants and Defendant–Intervenors argue that *Lujan* and *SUWA* require FSEEE to challenge each individual application of chemical fire retardant. Unlike *Lujan,* however, here there are specific agency documents (guidance documents, contracts for fire retardant, fire fighting manuals) that constitute final agency action. *See Barrick Goldstrike Mines, Inc. v. Browner,* 215 F.3d 45, 48 (D.C.Cir.2000). The nebulous "land withdrawal review program" was a conglomeration of over 1250 separate actions occurring at various points in the past, present and future; the Court held this program had no "immediate or threatened effect." Here, there is an immediate effect when fire retardant is used on national forests. The primary similarity between *Lujan* and the present case is that the USFS's authorization to use chemical fire retardant is not site spe-

cific. An important distinction is that the individual, site-specific actions that *Lujan* plaintiffs characterized as the "land withdrawal review program" were subject to NEPA before implementation. There was no immediacy in *Lujan.* The present case is unlike timber sales, forest plan revisions or most other agency actions that prompt suits seeking to compel NEPA compliance. In most situations time is not of the essence and the law generally requires a site specific plan before NEPA compliance is required. *See, e.g., Ohio Forestry Ass'n. v. Sierra Club,* 523 U.S. 726, 734, 118 S.Ct. 1665, 140 L.Ed.2d 921 (forest plans are not subject to judicial review because the plans themselves do not establish or deny legal rights or cause environmental harm; any site specific actions authorized by the forest plan are the proper focus of judicial review). Here, it is impossible to do an EIS between the time that the person in charge of a particular fire-fighting operation orders the use of chemical fire retardant and the actual use of the retardant. If Defendant is correct, the application of fire retardant to national forests, which most likely has significant effects on the environment, is completely insulated from NEPA because the decision to apply retardant does not occur until the aircraft is dispatched to a particular fire on a particular piece of land. Such a reading does not comport with the goals of NEPA and would allow federal agencies to evade NEPA by allowing final decisions to be made "on the ground" by local officials.

In *SUWA,* the Court held that a claim under 5 U.S.C. § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take. SUWA,* 124 S.Ct. at 2379. Unlike the nonimpairment mandate at issue in *SUWA* or the decision to allow mining on previously withdrawn public lands at issue in *Lujan,* there is no agency discretion involved in the decision to con-

sult NEPA. NEPA requires an EIS for any "proposals for legislation and other major federal actions significantly affecting the quality of the human environment." 42 U.S.C. 4332©. Here, Plaintiffs challenge a discrete action, the decision to use chemical fire retardant without consulting NEPA. *SUWA* makes clear that the manner of action is left to the agency's discretion, so that the federal courts cannot tell federal agencies exactly what NEPA documents to prepare, but can only order agencies to comply with NEPA. *SUWA*, 124 S.Ct. at 2380.

Defendant repeatedly cites *ONRC Action v. BLM*, 150 F.3d 1132, 1137 (9th Cir.1998) for the proposition that "a final agency action is one where there is a deliberate decision ... to act or not to take an action." In *ONRC Action*, environmental plaintiffs challenged the BLM's refusal to halt certain actions pending completion of an EIS covering all public lands east of the Cascades in Washington and Oregon. *ONRC Action*, 150 F.3d at 1134. The EIS was not site specific, but regional in nature. The plaintiffs argued that BLM's failure stop certain actions pending the EIS was itself a final agency action. *ONRC Action*, 150 F.3d at 1135–36. The court relied on *Lujan*, finding that there was "no identifiable agency, order, regulation, policy or plan that may be subject to challenge as a final agency action." *ONRC Action*, 150 F.3d at 1136. There was no final agency action not because the challenge was not aimed at a site-specific project, but "because ONRC cannot point to a deliberate decision by BLM to act or not to take an action." *ONRC Action*, 150 F.3d at 1137.

Defendant contends *ONRC Action* supports its argument that because there is no specific USFS document mandating the use of fire retardant, there is no final agency action. Plaintiff responds that fi-

nal agency action may result "from a series of agency pronouncements rather than a single edict." *Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 48 (D.C.Cir. 2000).[1] Plaintiff cites the following as the "series of agency pronouncements" evidencing the USFS's decision to use chemical fire retardant to fight fires on national forests:1) Defendant claims that chemical fire retardant is an "important tool in the USFS toolbox;" 2) the USFS determines at the national level which retardants to use; 3) the USFS contracts for fire retardant at the national level; 4) the USFS has nationwide environmental guidelines regulating the use of fire retardant; 5) The USFS offers training for the use of retardant; and 6) there are additional manuals, handbooks, and pocket guides concerning the use of fire retardant. *Pl's. Response to Def's. Mot. for S.J.*, page 4–5 (July 30, 2004). The D.C. Circuit has held that a guideline or guidance document can itself be final agency action. *Barrick Goldstrike Mines, Inc.*, 215 F.3d at 48.

Defendant responds that none of the "agency pronouncements" identified by Plaintiff constitute a national decision regarding whether to apply chemical fire retardant to any specific fire. Defendant says this decision is made at the local level and there is no final agency action, because the "consummation" of the decision making process does not occur until the decision is made by the incident commander. Defendant's interpretation means the use of chemical fire retardant is completely immune from NEPA because there is no time to conduct NEPA analysis in between the time that the fire coordinator decides that chemical fire retardant will be used and its application. This is perhaps the type of narrow construction of NEPA that Congress intended to stop in stating that NEPA is to apply to the "fullest extent possible." *See Jones*, 792 F.2d at 826.

---

1. There appears to be no Ninth Circuit au- thority for this proposition.

Both parties cite *Northcoast Environmental Center v. Glickman* (*NEC*), 136 F.3d 660, (9th Cir.1998) (*NEC*) in support of their final agency action arguments. In *NEC*, environmental plaintiffs challenged the BLM and the USFS's decision not to prepare a programmatic EIS covering the inter-agency Port–Orford cedar (POC) management plan. 136 F.3d at 665. The POC management plan contained a USFS action plan and BLM Management Guidelines. *Id.* The plaintiffs argued that the failure to complete a programmatic EIS for the POC management plan was a final agency action subject to judicial review under NEPA. *NEC*, 136 F.3d at 667. The court thought it was a "close call," but held that the POC program had no " 'actual or immediately threatened effect' as required by *Lujan*." *NEC*, 136 F.3d at 666–70. Further, the POC plan did not significantly affect the quality of the human environment as required by NEPA because the POC plan did not call for specific actions affecting the environment. *NEC*, 136 F.3d at 670. Finally, the court recognized that because NEC could challenge the agencies' NEPA compliance when there was agency action, the plan would not evade NEPA review. *Id.*

This case is unlike *NEC* for the same reason it is unlike *Lujan*. The USFS decision to allow the use of chemical fire retardant on national forests has a direct immediate effect on the environment. Further, if a programmatic EIS is not required, the use of chemical fire retardant will completely evade NEPA because it would be impossible to consult NEPA after a site-specific action is proposed and approved, i.e., when the incident commander orders application of chemical retardant.

Finally, the *SUWA* Court said "the principal purpose" of the APA limitations is "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *SUWA*, 124 S.Ct. at 2381. The Court explains that these "APA limitations" prevent courts from managing the New Orleans Jazz National Historical Park to preserve knowledge of the history of jazz or from managing the Steens Mountain Cooperative Management and Protection Area for the benefit of present and future generations. *Id.* The Court says the "prospect of pervasive oversight by the federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA." *Id.*

Here, Plaintiff is not asking this Court to oversee how the USFS fights fires. Plaintiff has asked this Court to decide a legal question, whether or not the USFS is required to consult NEPA before taking a major federal action which undoubtedly has a significant effect on the environment.

Under *Hall v. Norton*, the USFS decision not to prepare an EIS or consult NEPA can itself be a "final agency action." 266 F.3d at 975 n. 5. Further, there is probably final agency action under the two-part test used by the Supreme Court: 1) the USFS decision to use chemical fire retardant is the consummation of the agency's decisionmaking, this decision is not tentative or interlocutory, the agency does not intend to change its mind; and 2) "legal consequences" flow from this decision, chemical retardant has been dumped on FSEEE's members and has resulted in fish kills. *Bennett*, 520 U.S. at 177–78, 117 S.Ct. 1154. Finally, under *SUWA*, the USFS has failed to take a *discrete* action, that it is *required to take*. There is no agency discretion with respect to whether NEPA is applicable. Plaintiff has demonstrated that this Court has statutory jurisdiction under the APA.

### 3. Major Federal Action requiring an EIS

NEPA requires federal agencies to prepare an EIS for "every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332©. The NEPA regulations promulgated by the Council on Environmental Quality specifically contemplate EIS's for "broad federal actions." 40 C.F.R. § 1502.4(b).

Defendant–Intervenors focus on the lack of a "proposal," while Defendants claim there is no "major federal action." Both cite *Conner v. Burford*, 848 F.2d 1441, 1446, 1448 (9th Cir.1988) (whether agency action constitutes an "irreversible and irretrievable commitment of resources" turns on whether the government has the "absolute right" to prevent the use of the resources in question) and *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir.1998) (Forest Service's "Tentative Operating Schedule" for long term timber sales was not "irretrievable commitment of resources" because it did not compromise the government's absolute right to prevent all activity) as authority for their position that the agency must have reached the "go/no go point" and that there must be an "irreversible and irretrievable commitment of resources." In this sense, their very technical argument against the presence of a major federal action is the same as it was against presence of a "final agency action:" because there is no national decision mandating the use of chemical fire retardant on any particular piece of land and because the deci-

sion to use chemical fire retardant is made by the incident commander, there is no irretrievable commitment of resources, and thus no "major federal action," until this decision is made. Defendants then argue that at this time it is too late to involve NEPA, so the use of chemical fire retardant is immune from NEPA. In each of the cases cited by Defendants there was time for NEPA analysis before any significant environmental impacts. Here there is not. If Defendants succeed in this argument, federal agencies can circumvent NEPA by delaying the "irretrievable commitment of resources" until it is too late for NEPA review.

Plaintiff responds that "a proposal may exist in fact as well as by agency declaration that one exists," 40 C.F.R. § 1508.23, and that the USFS is "long past the proposal stage" considering that chemical fire retardant has been used on national forests for decades. *See Environmental Defense Fund, Inc. v. Andrus*, 596 F.2d 848, 851 (9th Cir.1979) (action has been taken and agency is beyond "proposal" or "mere contemplation of action" where contracts committing water for industrial use have been executed). In Plaintiff's view, the USFS has gone beyond a mere proposal for major federal action, and have been taking major federal action that significantly affects the environment for decades without the benefit of an environmental impact statement.[2]

■ Defendant says that in addition to the lack of an "irretrievable commitment of resources," there are no immediately threatened impacts to the environment,[3] because the "availability of retardant does

---

**2.** Along these lines, Defendants also argue that an EIS is not necessary where a proposed federal action would not change the status quo, citing *National Wildlife Federation v. Espy*, 45 F.3d 1337, 1343 (9th Cir.1995). Defendant must be arguing that because their violation of NEPA occurred a long time ago

the violation is the "status quo" and this Court is powerless to do anything about it.

**3.** Defendant–Intervenor concedes that "a site-specific application of fire retardant might have a significant environmental effect." *Def.-Intervenors S.J. Response Memo.*, page 5 (July 30, 2004).

not commit resources to a particular site-specific project or have an actual impact on the landscape." *Def's. Memo. in Support of Mot. for S.J.*, page 16. According to Defendant, the "availability of fire retardant" does not impact the environment. Defendant analogizes lack of impact to the POC program at issue in *NEC*, which the Ninth Circuit said did not significantly affect the environment. 136 F.3d at 670. Plaintiff claims that there have been significant environmental effects: fire retardant has been dumped on firefighters, has been dumped on national forests for decades, and has resulted in fish kills. Plaintiff is not required to show actual environmental harm. To show that the agency violated its duty to prepare an EIS in the Ninth Circuit, a plaintiff need not show that a significant effect will in fact occur, only that substantial questions are raised as to whether a project *may* have a significant effect. *Blue Mountains Biodiversity Project*, 161 F.3d at 1212. (emphasis added) (citing *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir.1998). It is probable that substantial questions are raised here as to the environmental impact of the annual dumping of millions of gallons of chemical fire retardant on national forests.

Defendant–Intervenors argue that even if it were required, a nationwide programmatic EIS would not satisfy NEPA's requirements for EIS. *Def.-Intervenors Memo. in Support of Mot. for S.J.*, pages 9–13; *Def.-Intervenor's Reply to Pl's. Response to Mots. for S.J.*, pages 4–6 (August 12, 2004). Defendant–Intervenors thus argue that there is no violation because there is no appropriate remedy. This argument is irrelevant. Though Plaintiffs asked this Court to compel an EIS, *Pl's. Mot. for S.J.*, page 1 (June 25, 2004), Claim 1 of the

Complaint alleges that the USFS violated NEPA by failing to conduct an *EA or an EIS*. *Pl's. Complaint*, page 12 (October 14, 2003) (emphasis added). Further, relief requested by Plaintiff is that this Court 1) declare the USFS's failure to prepare an EA or an EIS a violation of NEPA, and 2) compel the USFS to comply with applicable environmental statutes. *Pl's. Complaint*, page 16. In any event, under *SUWA*, federal courts cannot compel agencies to take specific actions, but can only compel the agencies to act. *See SUWA*, 124 S.Ct. at 2380. Thus, this Court can compel the USFS to comply with NEPA, but cannot compel it to conduct an EIS as opposed to an EA. That is a manner of action left to the agency's discretion. *Id.*

## 4. Conclusion: The USFS decision not to consult NEPA regarding the use of chemical fire retardant on national forests is unreasonable

■ There is a "final agency action" establishing jurisdiction over Plaintiff's NEPA claim and there is "a proposal for major federal action significantly affecting the environment, the USFS's decision not to engage NEPA by preparing an EA or an EIS is reviewed under a "reasonableness" standard. *Northcoast Env. Cntr. v. Glickman*, 136 F.3d 660, 667 (9th Cir.1998) (*NEC*). The "reasonableness" standard is applicable for primarily legal questions, such as the decision whether NEPA is applicable; the "arbitrary and capricious" standard is applied to review agency action regarding factual or technical matters. *Id.* The "reasonableness" standard is less deferential to the agency than the "strong level of deference" due under the arbitrary and capricious standard.[4] *Id.* Courts should defer to an agency's decision not to prepare an EIS only if that decision is "fully informed and well-considered." *Save*

---

4. Defendant–Intervenors argue that standards do not "materially differ," *Defendant Intervenors' Brief* at page 3. However, the cases cited

by Defendant–Intervenors in support of this theory all address the adequacy of NEPA documents, not whether NEPA is applicable.

*the Yaak Committee v. Block,* 840 F.2d 714, 717 (9th Cir.1988). In reviewing the USFS's decision not to prepare an EIS, the inquiry is whether the USFS has "reasonably concluded that the project will have no significant adverse environmental consequences." *Id.* Further, the decision not to prepare an EIS is also unreasonable if: 1) "substantial questions are raised regarding whether the proposed action *may* have a significant effect upon the human environment;" and 2) the USFS failed to "supply a convincing statement of reasons why potential effects are insignificant." *Id.* (citations omitted). The statement of reasons is crucial to determine whether the FS took a "hard look" at potential environmental consequences. *Id.*

 In this case, the USFS decision not to consult NEPA in the annual dumping of millions of gallons of chemical fire retardant on the national forests is unreasonable. The decision of NEPA applicability is a legal question. It is not the type of scientific, factual or technical question to which the agency is afforded a high-level of deference. The agency decision here was not "fully informed and well considered." In fact, all evidence suggests that the USFS was told by other agencies to consult NEPA on fire retardant issues. The decision not to involve NEPA appears to be a political decision. The only reason the USFS has provided for not applying NEPA is that the USFS determined, after an EA was complete and ready for signature, that there was no proposal for major federal action. This is not a reasonable conclusion that the project has no environmental questions and is thus unreasonable.

**C. ESA Claim (Claim 3: The USFS failure to consult with the FWS concerning its regular use of chemical fire retardant is a violation of Section 7 of the ESA).**

The Endangered Species Act (ESA) provides that federal agencies shall "insure that any action authorized, funded, or carried out by such agency [hereinafter in this section referred to as an 'agency action'] is not likely to jeopardize the continued existence of any endangered species or threatened species" unless granted an exemption pursuant to subsection (h). 16 U.S.C. § 1536(a)(2); *Bennett,* 520 U.S. at 158, 117 S.Ct. 1154. If the agency determines that an action it proposes to take may adversely affect a listed species, it must engage in formal consultation with the FWS (or the NMFS), after which the FWS must provide the agency with a written statement (the Biological Opinion) explaining how the proposed action will affect the species or its habitat. 16 U.S.C. §§ 1536(a)-©; 50 C.F.R. § 402.14; *Bennett,* 520 U.S. at 158, 117 S.Ct. 1154. If the FWS concludes that the proposed action will jeopardize the continued existence of a threatened species or an endangered species, the Biological Opinion (BO) must outline any "reasonable and prudent alternatives" that the FWS believes will avoid that consequence. 16 § 1536(b)(3)(A); *Bennett,* 520 U.S. at 158, 117 S.Ct. 1154. If the BO concludes that the agency action will not result in jeopardy or adverse habitat modification, or if it offers reasonable and prudent alternatives to avoid that consequence, the FWS must provide the agency with an Incidental Take Statement specifying the "impact of such incidental taking on the species," any "reasonable and prudent measures that the [FWS] considers necessary or appropriate to minimize such impact," and setting forth "the terms and conditions ... that must be complied with by the Federal agency ... to implement [those measures]." 16 U.S.C. § 1536(b)(4); *Bennett,* 520 U.S. at 158, 117 S.Ct. 1154.

 There is no requirement for "final agency action" with regard to the ESA claim because Plaintiff has brought suit under 16 U.S.C. § 1540(g), the "citizen

suit" provision of the ESA. *See SUWA*, 124 S.Ct. at 2378. "Action" for ESA purposes means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; © the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02 (2004).[5] The term "agency action" has been defined very broadly with respect to the ESA. *Natural Resources Defense Council v. Houston*, 146 F.3d 1118, 1125; *TVA v. Hill*, 437 U.S. 153, 173, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (ESA § 7 applies to all actions "authorized, funded, or carried out" by the agency; "[t]his language admits of no exception").

▆▆▆ Plaintiff finds "action" under the ESA claim in the same conduct that was a "major federal action" for NEPA purposes. Defendant's counter-arguments are also the same. Defendant claims that determining the types of fire retardant to approve for use, the issuance of guidelines for fire retardant application, the USFS nationwide contracts for retardant, and the long-time use of chemical fire retardant are not programmatic activities that require consultation. Defendant, citing *SUWA* and *Lujan*, argues these are not "actions" triggering consultation within the meaning of the ESA, and that there is no effect upon listed species until the USFS engages in site-specific activities.

Just as the USFS's authorization, funding, and use of chemical fire retardant to fight fires on national forests is "major federal action" for purposes of NEPA, it is an "action" under the ESA.[6] The definition of "action," particularly subsection (d), is very broad, and such a broad reading comports with the Supreme Court's reading of the ESA: "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *TVA*, 437 U.S. at 194, 98 S.Ct. 2279.

Defendant and Defendant–Intervenors claim that the USFS's use of the emergency consultation procedures described in 50 C.F.R. § 402.05 sufficiently satisfies the USFS obligations under 16 U.S.C. § 1536. However, the emergency consultation provision of 50 CFR 402.05 is not a substitute for required consultation under 16 U.S.C. §§ 1536(a)-©. The emergency provision of § 402.05 allows for informal consultation "when there is a need to consult in an expedited manner;" this informal consultation still must be "consistent with the directives of sections 7(a)-(d) of the Act." 50 C.F.R. § 402.05(a). Further, 50 C.F.R. § 402.05(b) makes clear that "formal consultation shall be initiated as soon as practicable after the emergency is under control." The USFS's emergency

---

**5.** The definition of "destruction or adverse modification" contained in 50 C.F.R. § 402.02 was held invalid as contrary to the Congressional intent behind the ESA. *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059, 1069 (9th Cir.2004). However, the definition of "action" is presumably still valid as there was no mention in the case of the definition of "action" in 50 C.F.R. § 402.02.

**6.** Though the USFS argues that the opinions of FWS staff biologists are those of the individuals, and not of the agency, it must be noted that the USFS's own briefing paper recognizes that the FWS and NMFS have advised the USFS that there has been "action" and formal consultation is required. *Pl's Memo. In Support of Mot. for S.J.*, page 18; *Pl's Exhibit 39*.

consultation after retardant drops in waterways does not excuse the failure to consult under 16 U.S.C. §§ 1536, particularly in light of the fact that three of the six retardant dumps into waterways on national forest lands were determined by the USFS to have a "May effect, likely to adversely effect" impact on listed species, though none of these three emergency consultations resulted in a "jeopardy" finding by the FWS. *Def's. Statement of Uncontroverted Facts,* ¶ 47.

The unique temporal considerations arising from the USFS's procedures for the use of fire retardant mean that, as in the NEPA context, the agency can evade ESA compliance unless the Court finds that the USFS's actions in planning and preparing for the use of fire retardant constitutes action under the ESA. There is nothing in the case law or statutes to suggest that the ESA permits certain agency actions to be exclusively evaluated under the lesser strictures of the emergency consultation procedures of 50 C.F.R. § 402.05. The requirement in emergency situations that formal consultation be initiated as soon as practicable after the emergency is under control demonstrates that under the ESA framework, emergency consultation is intended to be the exception, not the rule. The emergency exception is meant for unexpected exigencies. The use of fire retardant by the USFS is not unexpected but guaranteed; the only question is when and where it will be used. There is no reason why the USFS cannot conduct formal consultation with FWS and no reason to find that the ESA requires anything less. The remedy here is an order to the USFS to engage in formal consultation with FWS regarding the use of fire retardant in national forests.

### III. Conclusion

Based on the foregoing, Plaintiff's motion for summary judgment on Claims 1 and 3 are Granted. Defendant and Defendant–Intervenor's motions for summary judgment on Claim 2 are Granted. USFS shall comply with NEPA and begin formal consultations with FWS as required by ESA § 7. Plaintiff's Complaint requests additional injunctive relief to "prevent irreparable harm," but does not specifically ask that the Court enjoin continued use of fire retardant. The request is Denied as moot.